THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE OSCAR SALGADO, Defendant-Appellant.

Second District   No. 2—92—1097

Opinion filed June 14, 1994.

Dennis Doherty, of Chicago, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Jose Oscar Salgado, the defendant, was indicted by a Kane County grand jury for one count of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1) (now codified, as amended, at 720 5/9—1(a)(1) (West 1992))), and two counts each of attempted murder (Ill.

Rev. Stat. 1989, ch. 38, pars. 8—4(a), (c)(1) (now codified, as amended, at 720 ILCS 5/8—4(a), (c)(1) (West 1992))), and armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))), in connection with a gang-related shooting spree in Aurora on June 3, 1990. Following unsuccessful motions by the defendant to have his statements to police and certain identification evidence suppressed, the matter proceeded to a jury trial on April 6, 1992. The defendant was convicted on all counts, and this appeal followed. We now reverse and remand for a new trial.

This case arose from a gun battle in Aurora between rival street gangs, the Latin Kings and the Insane Deuces. The defendant and three codefendants, Jorge Carvajal, Brian Torres and Jose Angel Loera, all members of the Insane Deuces, were charged with the murder of Dennis Evans and the shooting of Kerry Stewart and Michael Banuelos. Evans and Stewart were members of the Latin Kings; Banuelos was not a gang member.

Aurora police officers David Johnston and Scott Wolters testified that they were on patrol about 10 p.m. on June 3, 1990, when they heard gunshots coming from several blocks away in the area of Beach Street between Liberty and Columbia. At Beach Street, they found a chaotic scene, with several persons running and yelling. Evans lay in the street with a gunshot wound to the head. He was taken unconscious to Copley Hospital, where he died the next day. Stewart had a gunshot wound to his ankle, and Banuelos had a gunshot wound in his chest and a collapsed lung. Police recovered 25 9-millimeter shell casings from the scene and one casing from a smaller gun.

Officer William Powell said he interviewed Alex Ramos on Beach Street at 10 the night of the shooting, and Ramos identified three shooters as Corey Torres, Coco Loco and Oscar. In reference to Oscar, Powell said he asked, "Salgado?" to which Ramos responded, "yes." Powell went to the defendant's home at 1:30 a.m. but did not locate him.

Officer Thomas Davis testified that Ramos came to the police station at 11 on the night of the shooting and reported that he was at the scene and saw who did the shooting. Ramos signed a typewritten statement in which he identified four men, including the defendant, as shooters.

Officer Marshall Gauer said that he and Terry Wegman interviewed the defendant about 9:35 the morning after the shooting. Gauer said he obtained a *Miranda* waiver (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) from the defendant and then questioned him about his whereabouts on June 3 from noon onward. The defendant told him that he was at home with his

girlfriend from 2 to 6 p.m. that day, and he then went to a friend's house for the remainder of the day. Gauer said he told the defendant that he did not believe him, and the defendant then stated that he and his friend went to a gas station that evening. The defendant claimed he did not learn of the shooting until the following morning when his mother took him to court for an appearance in an unrelated matter.

Gauer then told the defendant that several witnesses had implicated him, and the defendant then said that he called Angel Loera around 8 o'clock on the night of the shooting and that he met Loera and the other codefendants later that night. The defendant denied having a gun that night.

Pursuant to a search warrant, police recovered a silver pistol, a 9-millimeter semiautomatic pistol, and a box of .44-caliber ammunition from Loera's home. No latent fingerprints were found on the guns or ammunition. A firearms identification expert testified that the spent 9-millimeter cartridges found at the shooting scene were fired from the gun recovered from Loera's home.

Kerry Stewart testified for the State that he was with a group of friends in front of a store at Beach and Liberty at 10 p.m. on June 3 when a car came up Beach Street with its headlights off. Stewart said that gang slogans were yelled back and forth, and Stewart joined others in chasing the car down the block. Shots then were fired, and Stewart was wounded. He did not see who fired any of the shots.

Three other occurrence witnesses, Davis Whisenant, Michael Banuelos and Robert Saltijeral, testified that they were together at Liberty and Beach when the shooting occurred. The three denied being gang members. Whisenant and Banuelos could not identify the shooters.

Saltijeral said he saw three men that night and recognized them as the defendant, Angel Loera and Corey Torres. Saltijeral said that at first he did not pay the three any attention and continued walking. When he heard shots, Saltijeral said he turned and saw the defendant, Loera and Torres shooting. Saltijeral denied making any deals to testify. He said he did not talk to the police the night of the shooting, but spoke to them later at the courthouse.

Saltijeral admitted that when he was contacted shortly prior to trial by the defendant's attorney and her investigator, he told them that he could have been mistaken and might not have seen the defendant on the night of the shooting. However, at trial, Saltijeral testified that he was certain that the defendant was one of the shooters. He said that he made the contradictory statement prior to trial because "I didn't want to be mean to you guys [defense attorney

and investigator] and tell you guys to leave. I didn't want to say nothing." On redirect examination, Saltijeral said he lied to the defendant's attorney and investigator "because I didn't want to be hassled."

Alex Ramos, a member of the Latin Kings, testified for the State that he was a friend of one of the victims, Dennis Evans, and he knew that the defendant was a member of the rival Insane Deuces. Ramos testified that he was at the scene of the shooting but did not see the shooters. Ramos admitted that he had talked to Officer Powell shortly after the shooting, but he denied telling Powell that he had seen the shooters or that he gave Powell any names. Ramos said he gave a written statement to Officer Davis, but he claimed that Davis supplied the names of the shooters. Ramos admitted that he signed the police statement in which he identified the defendant as one of the shooters.

Ramos said that Davis showed him four photographs by placing all four in front of him at once. Ramos said he identified the four because he knew the men but that Davis did not ask if they were the shooters. Ramos acknowledged that he testified during a suppression hearing that he had seen four shooters, that he recognized each of them, and that he gave their names to police.

Ramos said that about a week before trial he met with Assistant State's Attorney Cathy Cavins at the Kane County courthouse, at which time he told Cavins that he had not seen anything during the shooting incident. Ramos said that Cavins instructed him to testify that he had seen the shooters and to identify them as Torres, Loera, and the defendant. Ramos said that Cavins offered to pay him $1,000 for the false testimony but that he never was paid.

Cavins testified that she never told Ramos to lie and never offered to pay him for his testimony. She said that Ramos told her he wanted to testify against the defendant because he was a friend of Evans.

The defendant did not testify, but he called five occurrence witnesses. Gerardo Morga, a member of the Latin Kings, said he was at the shooting scene but did not see the defendant there. Marcial Roldan, also a Latin King, testified that he was angered over the shooting and, therefore, told police following the shooting that the defendant was one of the shooters when in fact he could not identify any of the shooters. In rebuttal, the State presented Officer William Powell and police investigator Deborah Porter, who testified that Morga and Roldan had given them statements that implicated the defendant.

Irving Childress, a Latin King, testified that he saw two men shooting at the scene and that neither was the defendant. Michael

Waters, who refused to say whether he was a gang member, testified that he saw two of the shooters and that neither was the defendant.

Fidel Elizondo, a former Latin King, testified that he saw one man at the shooting, but it was not the defendant. Both Waters and Elizondo said they had been offered a deal of being released from probation in exchange for testifying for the State at the codefendants' trial.

The defendant also produced witnesses who claimed to be with him the night of the shooting. Francisco Ignacio said the defendant stayed overnight with him at his home. Gilbert Quintanilla testified that he saw the defendant at about 8:20 the night of the shooting and that the defendant was very drunk. Quintanilla said he left the party about 20 to 30 minutes later, and the defendant was still there.

During its deliberations, the jury sent a note to the judge asking when and to whom Saltijeral had identified the men who shot the victims. The jurors were instructed to rely on their recollection. The jury then returned guilty verdicts on all five counts.

Following the denial of the defendant's motion for a new trial, a sentencing hearing was conducted on August 12, 1992. The court found three aggravating factors and no mitigating factors. The court sentenced the defendant to 45 years in prison on the murder count and to concurrent 20-year prison terms for the two attempt convictions. The court dismissed the armed violence counts.

On appeal, the defendant claims that: (1) he was not proved guilty beyond a reasonable doubt; (2) the jury was confused by inadequate instructions as to whether it could consider certain inconsistent statements as substantive evidence or merely as impeachment; (3) the trial court improperly admitted into evidence statements he made to the police; (4) the trial court considered an improper aggravating factor in sentencing; (5) he was denied the effective assistance of counsel at trial; and (6) the State improperly failed to turn exculpatory information over to the defense.

Our review of the record convinces us that the defendant was denied his constitutional right to the effective assistance of counsel. Therefore, we reverse and remand for a new trial.

In order to succeed in a claim of ineffective assistance of counsel, a defendant must establish that the performance of his attorney at trial fell below an objective standard of reasonableness and that the deficient performance so prejudiced the defendant that he was denied his constitutional right to a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) Illinois follows the *Strickland* test. (*People v. Albanese* (1984), 104 Ill. 2d 504, 526.) A defendant must establish both prongs of the *Strick-*

*land* test to succeed in an ineffective assistance claim. (*People v. Johnson* (1993), 154 Ill. 2d 227, 234.) Ineffective assistance is most likely to be found when several, rather than isolated, errors are made by a defense attorney (*People v. Hooker* (1993), 253 Ill. App. 3d 1075, 1086) and when the evidence in the case is closely balanced. *People v. Garza* (1989), 180 Ill. App. 3d 263, 269-70.

This was a closely balanced case, and our review of the record discloses that the defendant's counsel made two crucial errors: (1) counsel either failed to investigate Saltijeral's testimony from the codefendants' trial or ignored that prior testimony and failed to use it as impeachment; and (2) counsel did not request that the jury be advised as to which evidence could be considered substantively and which was impeachment only. We do not adopt the defendant's argument that a trial attorney has a duty to obtain transcripts of prior testimony of opposing witnesses. Rather, we determine that the defendant in this case was denied the effective assistance of counsel because the attorney did not make use of obviously useful impeachment against a key State's witness, which the defendant's counsel knew existed.

## SUPPLEMENTAL RECORD

As a preliminary matter we consider the State's motion on appeal to strike from the defendant's reply brief excerpts of a transcript from the codefendants' trials, which the defendant offers in support of his ineffective assistance claim. The transcript in question provides evidence that Robert Saltijeral, the only witness who claimed at the defendant's trial to have seen the defendant shooting, had testified at the trial of the codefendants that he did not see any of the shooters.

In support of its contention, the State cites *People v. Pertz* (1993), 242 Ill. App. 3d 864, in which we overruled our own prior decision to permit a defendant to supplement the appellate record to include certain photographs, which the defendant claimed should not have been published to the jury and sent back with the jury for its deliberations because they were gruesome and prejudicial. (*Pertz*, 242 Ill. App. 3d at 905-06.) We determined that permitting the defendant in that case to supplement the record would set a dangerous precedent of "allowing *** 'piecemeal creation of the record, with supplemental briefing and rebriefing, all to the derogation of the appellate process.'" *Pertz*, 242 Ill. App. 3d at 905.

However, *Pertz* does not hold that supplementation of the record is never appropriate. Supreme Court Rules 329 and 366 (134 Ill. 2d Rules 329, 366) grant appellate courts the discretion to permit the amendment and supplementation of the record.

In the present matter, the appellate defender's office filed the initial brief, which did not contain a claim of ineffective assistance. The appellate defender then was permitted to withdraw as counsel for the defendant in favor of private counsel. We granted the defendant's new counsel leave to file a supplemental brief, which contains the ineffective assistance claim. The claim is based, in large part, on the alleged failure by trial counsel to impeach Saltijeral with his prior testimony.

While we certainly want to avoid piecemeal supplementation of the record, we will never sacrifice justice at the altar of expedient procedure. If we were to ignore the clear indication presented in the supplemental brief of failure to impeach, we might well be opening the door to further time- and resource-consuming appeals, which would certainly do more violence to appellate practice than the short delay caused by our allowing the defendant to file a supplemental brief.

Of course, the appellant bears the responsibility of providing a complete appellate record for review. (*People v. Blake* (1985), 130 Ill. App. 3d 948, 956), and any doubt arising from the incompleteness of the record must be resolved against the appellant. (*People v. Majer* (1985), 131 Ill. App. 3d 80, 84.) However, these cases do not require that we disregard important evidence.

■ Here, the appellant's supplemental brief contained citation to the appellate cases of the codefendants which recite that Saltijeral denied seeing any of the shooters. (*People v. Loera* (1993), 250 Ill. App. 3d 31, 35; *People v. Carvajal* (1993), 241 Ill. App. 3d 886, 889.) We agree that the summary of facts from these appellate cases is not sufficient to establish Saltijeral's precise testimony in those earlier cases. However, the facts related in those opinions sustain the defendant's position that the transcript of the prior trial reasonably portrays Saltijeral's testimony as being inconsistent and impeaching, and could reasonably have resulted in a different verdict had the prior inconsistent statement been presented on cross-examination. Additionally, the defendant's supplemental brief contained in an appendix excerpts from Saltijeral's testimony at the prior trial which substantiate the nature and extent of Saltijeral's prior inconsistent statements.

The State urges that transcripts from the codefendants' cases are not properly before this court and are not the proper subject of supplementation because they were not before the circuit court during the defendant's trial. The State cites *State Farm Mutual Automobile Insurance Co. v. Stuckey* (1983), 112 Ill. App. 3d 647, in support of this contention. However, *State Farm,* which involved a

civil arbitration proceeding, is inapposite. In that case, the trial court denied the insurance company's petition to vacate an arbitration award in favor of the Stuckeys. The trial court never had a transcript of the arbitration proceedings, and State Farm attempted to supplement the appellate record with the arbitration transcripts. We ruled that this was inappropriate. (*State Farm*, 112 Ill. App. 3d at 650.) In that case the arbitration transcript, or absence of it, was the basis of the entire case. That is not the situation here.

Typically, the reason for the rule restated in *State Farm* is to preclude the appellate court from second-guessing what the trial court would have done and how the opposing party might have responded to the additional record. In this case, it does not appear that the trial court or the State would have been confronted with having to respond to supplemented materials, as they are directed at what defense counsel should have procured in preparation for trial. The materials do not directly affect findings or determinations of the court or the presentation of the opposing party's case.

Although we believe we could properly consider the supplemental record, we decline to do so because we believe that we may take judicial notice of our own appellate opinions. Contained in those opinions is sufficient evidence to sustain the defendant's contention that his trial counsel ought to have utilized the Saltijeral transcript. We believe that a different result could reasonably have occurred had counsel impeached Saltijeral with his prior inconsistent trial statements.

## INEFFECTIVE ASSISTANCE

The most damaging evidence at trial came from Saltijeral, who testified that he saw the defendant shooting on the night in question, and Alex Ramos, who denied at trial that he saw the defendant shooting but acknowledged that he had given a signed statement to police at the time of the incident in which he identified the defendant as one of the shooters. Saltijeral, however, was the only witness at the defendant's trial to implicate him through direct testimony. Saltijeral testified at the prior trial of the codefendants that he did not see the defendant shooting on the night in question. (See *Loera*, 250 Ill. App. 3d at 35; *Carvajal*, 241 Ill. App. 3d at 889.) However, the defendant's attorney did not attempt to impeach Saltijeral with this crucial contradictory testimony.

Whether, and how, to cross-examine a witness is normally a matter of trial strategy, which will not by itself support a claim of ineffective assistance under *Strickland*. (*People v. Stewart* (1984), 104 Ill. 2d 463, 492.) However, the complete failure to impeach the sole

eyewitness when significant impeachment is available is not trial strategy and, thus, may support an ineffective assistance claim. See *People v. Skinner* (1991), 220 Ill. App. 3d 479, 484; *Garza*, 180 Ill. App. 3d at 269.

■ Here, the defendant's counsel referred to Saltijeral's prior testimony when cross-examining him, but he did not impeach him with his contradictory statement. It was not clear from the record whether defense counsel actually had seen the transcript, but counsel was clearly aware that Saltijeral had testified at a prior trial. If counsel knew of the contradictory statement, the failure to use them for impeachment was deficient performance. Alternatively, the failure to investigate whether the transcript held some useful impeachment would have been deficient performance.

When assessing the importance of the failure to impeach for purposes of a *Strickland* claim, "[t]he value of the potentially impeaching material must be placed in perspective." (*People v. Jimerson* (1989), 127 Ill. 2d 12, 33.) Here, the impeachment value of directly contradictory testimony made under oath at a prior trial by the State's premier eyewitness can hardly be overestimated.

The defendant's attorney also exhibited deficient performance by failing to seek clear and thorough instruction for the jury as to which evidence could be considered substantively and which could be considered only as impeachment.

"The purpose of impeaching evidence is to destroy the credibility of a witness and not to establish the truth of the impeaching evidence." (*People v. Bradford* (1985), 106 Ill. 2d 492, 499.) Ordinarily, a party may only use a prior inconsistent statement for impeachment. (*People v. Sullivan* (1992), 234 Ill. App. 3d 328, 332.) However, under section 115—10.1 of the Code of Criminal Procedure of 1963, a party may use a witness' prior inconsistent statement as substantive evidence when:

"(b) the witness is subject to cross-examination concerning the statement, and
(c) the statement—
(1) was made under oath at a trial, hearing, or other proceeding, or
(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
(A) the statement is proved to have been written or signed by the witness, or
(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior

statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." Ill. Rev. Stat. 1989, ch. 38, pars. 115—10.1(b), (c) (now 725 ILCS 5/115—10.1(b), (c) (West 1992)).

Unless a prior inconsistent statement clearly qualifies under section 115—10.1, it is not admissible as substantive evidence. *People v. Redd* (1990), 135 Ill. 2d 252, 314.

Here, the trial court gave the following limiting instruction at the close of evidence, along with other instructions:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. When evidence is received for that purpose only, you may use it only to decide the weight to be given the testimony from the witness in this courtroom."

The instruction was taken from Illinois Pattern Jury Instructions, Criminal, No. 3.11, Committee Note, at 70 (2d ed. Supp. 1989). However, nothing in that instruction informs the jury which statements are to be used for a limited purpose. Our supreme court has recognized the danger that juries will consider as substantive evidence of guilt testimony which is appropriate only as impeachment. (*Bradford*, 106 Ill. 2d at 499.) The court in *Bradford* noted that a jury should be cautioned and properly instructed as to the use of impeachment. *Bradford*, 106 Ill. 2d at 501.

■ There was a particular danger in this case that the jury would consider impeachment substantively because there were numerous prior inconsistent statements introduced at trial. Some qualified under section 115—10.1 as substantive evidence, and others did not. The defendant's attorney did not ask the trial court to instruct the jury at the time the impeaching statements went into evidence, which would have helped clarify matters, and did not ask that the court explain which statements could be considered substantively and which were to be used solely as impeachment.

We believe that the jury was likely confused by the numerous conflicting statements that it heard from an array of witnesses. The jury was given no guidance on how to sift through the five different statements given by Alex Ramos or the various inconsistent statements attributed to other State and defense witnesses. The jury expressed its confusion over Saltijeral's testimony when it sent a note to the court during deliberations asking when and to whom

Saltijeral had identified the shooters. The trial court declined to comment and instructed the jurors to rely on their recollection. We are not confident that the jury would have convicted the defendant had it known of the impeachment of Robert Saltijeral and had it been properly instructed.

The defendant next contends that the trial court committed reversible error when it denied his pretrial motion to have statements he made to the police suppressed as involuntary. A statement is admissible at trial if it was given freely, without compulsion or inducement by interrogating officials. (*People v. Tackett* (1993), 246 Ill. App. 3d 622, 625.) That determination must be made from the totality of circumstances, taking into account the characteristics of the defendant and the details of the interrogation. (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 1044.) Among relevant characteristics are the defendant's age, education, mental capacity, emotional characteristics, and experience in criminal matters. (*People v. Hester* (1968), 39 Ill. 2d 489, 497.) The trial court's decision on whether to suppress will not be disturbed on appeal unless it was against the manifest weight of the evidence. *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1007.

The defendant points out that he reads at only a fifth-grade level. However, limited mental capacity alone does not mandate a finding of involuntariness. (*Tackett*, 246 Ill. App. 3d at 626.) In *People v. Berry*, the appellate court determined that the statement of a 17-year-old defendant was not voluntarily given. However, that defendant was mentally handicapped, with an I.Q. of 80, had little formal education, was dependent upon his parents, lacked experience in criminal affairs, and was subjected to interrogation techniques that were deceptive and calculated to obtain a confession. *Berry*, 123 Ill. App. 3d at 1044-45.

■ Here, the defendant, though just 15 years old at the time of the shooting in question, had a good deal of experience with the police. Also, while his reading level was low, there is no evidence that he suffered from a mental disability that made him incapable of understanding his rights. Further, the police engaged in no inappropriate interrogation, and it was uncontested that the defendant was given his *Miranda* rights. Based on the totality of circumstances, the defendant failed to demonstrate that the court's ruling on the suppression matter was against the manifest weight of the evidence.

Also without merit is the defendant's claim that the State violated the dictates of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, when it failed to turn over to the defendant transcripts of Saltijeral's prior inconsistent testimony.

*Brady* holds that the prosecution has a duty to disclose exculpatory material to a defendant upon a specific request. (*People v. Harris* (1989), 129 Ill. 2d 123, 152.) Absent a specific request, *Brady* does not apply, and the State is required to turn over to the defense only those materials " 'so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce.' " (*Harris*, 129 Ill. 2d at 152, quoting *United States v. Agurs* (1976), 427 U.S. 97, 111-12, 49 L. Ed. 2d 342, 354, 96 S. Ct. 2392, 2401.) The *Brady* rule was incorporated into Supreme Court Rule 412(c). 134 Ill. 2d R. 412(c); *People v. Franklin* (1990), 135 Ill. 2d 78, 95.

■ In the present matter, the defendant made no specific request, and, although Saltijeral's prior testimony was clearly supportive of a claim of innocence, it was clear from the cross-examination of Saltijeral that the defendant's attorney was aware of the prior testimony. The prior inconsistent statements were contained in transcripts that were a matter of public record and no less available to the defendant than to the State. Thus, if the State were required to turn over evidence of public record to the defendant, it would be required to advise the defendant about matters, which neither *Brady* nor *Harris* requires.

■ Lastly, as to the defendant's claim that there was insufficient evidence to convict him, we believe that there was sufficient evidence from which a jury could conclude that the defendant was guilty beyond a reasonable doubt. This does not mean that we are making a determination of guilt or innocence that is binding on retrial. Rather, our consideration of the sufficiency of the evidence removes the risk that the defendant would be subjected to double jeopardy. *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10.

The judgment of the circuit court of Kane County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

WOODWARD and PECCARELLI, JJ., concur.