23 June 1999

No. 2--97--1104   

________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

________________________________________________________________

THE PEOPLE OF THE STATE OF   ) Appeal from the Circuit Court

ILLINOIS, ) of Kane County.

)

Plaintiff-Appellee, )

      )

v. ) No.  90--CF--832

)

BRIAN C. TORRES,    ) Honorable 

) Thomas E. Hogan,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

Modified Upon Denial of Rehearing

JUSTICE GEIGER delivered the opinion of the court:

The defendant, Brian C. Torres, appeals from the October 15, 1997, order of the circuit court of Kane County denying his postconviction petition for a new trial.  The defendant filed his petition after he was convicted by a jury of one count of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9--1(a)(1)) and two counts each of attempted murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8--4, 9--1(a)(1)) and armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A-2).  The trial court subsequently vacated the armed violence convictions, and the defendant was sentenced to concurrent terms of 50 years for the murder conviction and 30 years for the attempted murder convictions.  We affirmed the defendant's convictions on direct appeal.  See 
People v. Carvajal
, 241 Ill. App. 3d 886 (1993).  In the instant appeal, the defendant contends that the trial court erred in denying his postconviction petition, as he presented newly discovered evidence that indicated his possible innocence.

As our disposition of the prior appeal (
Carvajal
, 241 Ill. App. 3d 886) summarizes the circumstances of the defendant's conviction and sentence, we will provide only a summary of the relevant facts.  The charges in this case arose out of a gang-

related shooting spree that took place in Aurora on June 3, 1990, between members of the Insane Deuces gang and the Latin Kings gang.  As a result of the shooting, Dennis Evans died and Kerry Stewart and Michael Banuelos were injured.  On June 12, 1990, the defendant and three other members (Jorge Carvajal, Jose Salgado, and Jose Angel Loera) of the Insane Deuces gang were charged with the murder of Evans and the shooting of Stewart and Banuelos.  The defendant was tried with Loera and Carvajal, while Salgado was tried separately on a later date.

At the defendant's trial, Alex Ramos, a member of the Latin Kings, testified on behalf of the State.  Ramos testified that, at the time of the shooting and at the time of the trial, his gang and the Insane Deuces were at "war."  He further testified that on the night in question he saw Loera, Salgado, and the defendant at a nearby intersection holding guns.  In addition, Carvajal appeared between two nearby houses.  All four individuals then opened fire on the people in the street.  Ramos dropped to the ground and crawled to the fence.  After about 10 seconds, the gunshots ended, and Ramos saw that Evans had been shot.  When the police arrived, Ramos identified Salgado, Loera, and the defendant as the assailants.

Michael Waters, another Latin King gang member, testified that he saw three shooters on the night in question.  When Waters dropped to the ground, he recognized one of the shooters as the defendant.  Waters indicated that he did not want to testify in court.  He explained that, on the night in question, an officer overheard him identifying the shooters.  The officer then grabbed him and made him give this information.

Fidel Elizondo, a former Latin King gang member, testified that he did not speak with the police regarding the shooting until after his October 1990 conviction for burglary.  He admitted that, when he first spoke to the police, he lied and told them that he could not identify the shooters.  He subsequently identified the defendant as one of the shooters.  Elizondo testified that, after he spoke with the police, he was placed in a witness protection program.  On cross-examination, he testified as follows:

"Q. Did they make you any kind of an offer to tell you that they would cut your sentence down or give you any deal if you came in here and testified against [defendant]?

A. No.  I was already sentenced when I gave my statement."

Frank Ramirez, another Latin King gang member, testified that he saw the defendant firing shots while standing under a streetlight on the night in question.  Ramirez did not give this information to the police that night.  On the morning after the incident, he went to traffic court and saw the defendant in the building.  He then told the police that the defendant was involved in the shooting.  When he first spoke to the  police, he told them that there were four assailants, but he testified that he had lied and that there were only two assailants.

Robert Saltijeral, another occurrence witness, testified that he saw the defendant and Loera walking up to a streetlight.  However, he did not see who fired the shots.  He admitted that, on the night in question, he told the police that he did not see what happened.

Officer Scott Wolters of the Aurora police department testified that, when he searched Loera's house, he found two pistols, some gun magazines, and a plaque with gang graffiti.  A firearms expert testified that nine spent cartridge casings recovered from the scene of the crime were fired from one of the guns recovered from Loera's home.

The defendant presented the testimony of his mother, brother, and sister-in-law.  These relatives provided an alibi for the defendant from about noon on the day of the shooting until the next morning.

On April 18, 1991, following deliberations, the jury found the defendant guilty of all charges.  The defendant was sentenced to concurrent terms of 50 years for the murder conviction and 30 years for the attempted murder convictions.  As noted above, this court affirmed the defendant's conviction in 
Carvajal
, 241 Ill. App. 3d 886.  

On April 6, 1992, Salgado was tried on the same charges.  At Salgado's trial, Marcial Roldan, a member of the Latin Kings,  testified that he falsely told the police that Salgado was one of the shooters because he was angry about the shooting. 
 He testified that, in fact, he could not identify any of the shooters.  
People v. Salgado
, 263 Ill. App. 3d 238, 242 (1994).  

Ramos also testified at Salgado's trial.  Ramos testified that, about a week before Salgado's trial, he met with Assistant State's Attorney Cathy Cavins and told her that he had not seen anything during the shooting incident.  According to Ramos, Cavins instructed him to testify that the three shooters were Loera, Salgado, and the defendant.  Ramos testified that Cavins offered to pay him $1,000 for the false testimony but that he was never paid.  
Salgado
, 263 Ill. App. 3d at 242.  

Assistant State's Attorney Cathy Cavins testified that she never told Ramos to lie, and she denied offering to pay for Ramos's testimony.  She stated that Ramos told her that he wanted to testify against Salgado because he was a friend of Evans.  
Salgado
, 263 Ill. App. 3d at 242.

Also during Salgado's trial, Waters and Elizondo testified that they had been offered a deal from the State in return for their testimony in the defendant's trial.  In addition, Saltijeral testified that he saw Salgado, Loera, and the defendant at the scene of the crime.  However, he admitted that, shortly before Salgado's trial, he lied to Salgado's attorney and the investigator by telling them that he might not have seen Salgado on the night of the shooting.  He testified that he lied because he did not want to be "hassled."  
Salgado
, 263 Ill. App. 3d at 241-43.

Salgado was subsequently convicted of the charged offenses. However, this court reversed his conviction on grounds of ineffective assistance of counsel and remanded for a new trial.  
Salgado
, 263 Ill. App. 3d at 243.  Salgado subsequently pleaded guilty.

On January 5, 1994, the defendant filed a 
petition for postconviction relief.  As amended, the petition alleged that the defendant was entitled to a new trial because he had obtained newly discovered evidence.  Specifically, the defendant contended that (1) Salgado was now able to testify that the defendant was not a shooter during the incident because Salgado's trial was no longer pending; (2) he was not aware of Raldon's testimony until after his own trial; and (3) the State knowingly used perjured testimony at his trial.

During the hearing on the defendant's petition, Salgado testified that, after his conviction had been reversed, he pleaded guilty and received a shorter sentence.  He stated that he could not testify at the defendant's trial because his own case was pending.  Salgado testified that the defendant was not one of the shooters and had not been present at the time of the incident.  On cross-examination, he admitted that he had presented an alibi defense at his own trial.

Francisco Ramirez testified that he committed perjury at the defendant's trial.  He stated that the perjury was not his fault because he was told to say that the defendant was one of the shooters.  On cross-examination, he stated that he did not testify at the defendant's trial voluntarily.  He testified that prior to trial he was taken into custody by the police.  He was then taken to the county jail and eventually to the courtroom.  He denied that he made a deal with the State or that he posted bond.  He admitted that, at the time of the hearing, he was serving a 14-year sentence for possession of drugs.

Marcial Roldan testified that he did not see the defendant at the scene on the night in question.  He stated that he had been subpoenaed by the State to testify at the defendant's trial.  However, when he told the prosecutor, Cathy Cavins, that it was too dark for anyone to have identified the shooters, she told him that she could not use his testimony.  He admitted that, on the night in question, he agreed with Ramos's statement to the police that identified the shooters.  Roldan further admitted that he had been convicted of stealing a motor vehicle, burglary, aggravated battery, and unlawful use of a weapon by a felon.

The defendant testified that he filed his 
pro se
 postconviction petition when he learned that Waters, Elizondo, and Ramos had received cash and leniency in exchange for their testimony at his trial.  He stated that he was not provided with this information prior to or during his trial.  He testified that his trial counsel had never discussed the possibility of calling Roldan as a witness.  On cross-examination, the defendant testified that he was not aware that there was an order filed granting Ramirez a $200 cash bond on January 29, 1991, five days prior to the defendant's trial.

On October 15, 1997, the trial court denied the defendant's petition.  The trial court's order found that (1) Ramos had testified truthfully at the defendant's trial; (2) the State did not offer any deals to Saltijeral, Ramirez, or Roldan; (3) any deal offered to Waters and Elizondo was not sufficiently prejudicial to warrant a new trial; (4) Salgado's testimony was unbelievable based on the fact that Salgado presented an alibi at his own trial; and (5) even if Salgado's testimony was believed, it was insufficient to warrant a new trial.  The defendant filed a timely notice of appeal.  

On appeal, the defendant argues that the trial court erred in denying his postconviction petition, as he presented newly discovered evidence that indicated his innocence.  Specifically, the defendant argues that (1) the State improperly withheld evidence that certain witnesses had received leniency in exchange for testimony against him; (2) the State presented the perjured testimony of Ramos and Ramirez; (3) the testimony of Salgado would exculpate him; and (4) Raldon would testify that no one could identify the shooters because of the poor lighting on the night in question.

We first address the defendant's contention that, by failing to disclose that Elizondo and Waters had received a lesser sentence, the State violated the defendant's right to the due process of law.  See 
Brady v. Maryland
, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97 (1963) (holding that, in criminal prosecutions, the State has an affirmative duty to disclose evidence favorable to a defendant).  During the defendant's  trial, Elizondo specifically denied receiving anything in exchange for testifying against the defendant.  However, during Salgado's trial, both Elizondo and Waters testified that they had been offered deals releasing them from probation in exchange for testifying at the defendant's trial.  The defendant argues that the State did not disclose that such deals existed at any time prior to or during his trial.  As noted above, the trial court's October 15, 1997, order stated that any deal offered to Waters and Elizondo was not sufficient to warrant the granting of the petition.

A postconviction proceeding is not an appeal of the underlying judgment against the defendant but, rather, a collateral proceeding enabling the defendant to challenge a conviction or sentence for violations of his constitutional rights.  
People v. Johnson
, 183 Ill. 2d 176, 186 (1998).  The denial of a postconviction petition following an evidentiary hearing will not be reversed unless it is manifestly erroneous.  
People v. Coleman
, 183 Ill. 2d 366, 385 (1998).

The State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law.  
People v. Diaz
, 297 Ill. App. 3d 362, 372 (1998).  A prosecutor cannot knowingly use, or allow to go uncorrected, perjured testimony that goes to the substance of a witness's testimony or to facts that bear on the witness's credibility. 
 This includes both exculpatory evidence and impeachment evidence.  
Diaz
, 297 Ill. App. 3d at 372.  Evidence of any understanding or agreement between a witness and the prosecution as to any future prosecution is relevant to the witness's credibility, and the jury is entitled to know about it.  
Diaz
, 297 Ill. App. 3d at 372-73.  To establish a due process violation, the trial prosecutor need not have known that the testimony was false; it is enough that there was knowledge by representatives or agents of the prosecution.  
Diaz
, 297 Ill. App. 3d at 373.

In 
Diaz
, 297 Ill. App. 3d  362, the defendant was convicted of unauthorized delivery of contraband in a penal institution.  At trial, the State presented the testimony of 
a Cook County jail inmate. 
 During the trial, the inmate testified that he had received no promises for his testimony.  On appeal, the defendant argued that the State violated the 
Brady
 rule by withholding evidence that the inmate had in fact received a reduced sentence in exchange for his testimony against him. 
  In addition, the defendant argued that the State violated the 
Brady
 rule by failing to correct the witness's perjured testimony during the trial.  
Diaz
, 297 Ill. App. 3d at 370.

The Illinois Appellate Court, First District, held that the defendant was entitled to a new trial as a result of the State's failure to disclose such information.  In so ruling, the court noted that prior to trial the defendant had filed a discovery motion specifically requesting that the State reveal any record of any criminal or civil action pending against any witness and the outcome thereof.  
Diaz
, 297 Ill. App. 3d at 370-71, 373-74.  Notwithstanding this discovery request, the State failed to inform defense counsel that the inmate had received a concurrent sentence for two burglary convictions as part of a plea agreement for the inmate's cooperation with the State's Attorney's public integrity unit.  The reviewing court held that the State committed a 
Brady
 violation because it did not disclose information regarding the inmate's deal to defense counsel. 
 The court further concluded that the State improperly allowed
 the inmate's perjured testimony to go uncorrected.  
Diaz
, 297 Ill. App. 3d at 372-73.  

The 
Diaz
 court then considered whether the State had met its burden of demonstrating beyond a reasonable doubt that these violations did not contribute to the defendant's conviction.  After examining the evidence, the court found the State's conduct to be "outrageous" and concluded that the State had failed to demonstrate that these violations did not contribute to the defendant's conviction.  
Diaz
, 297 Ill. App. 3d at 374.  The court noted that, although the inmate's testimony was not the only evidence against the defendant, his testimony was crucial.  Based upon the State's violations, the court reversed the defendant's convictions and remanded the cause for a new trial.  
Diaz
, 297 Ill. App. 3d at 374.

In light of the principles articulated in 
Brady
, we conclude that the trial court erred in denying the defendant's petition.  At trial, Elizondo identified the defendant as one of the shooters on the night in question.  In addition, Elizondo denied that he received any promises in exchange for his testimony against the defendant.  Waters also identified the defendant as one of the shooters on the night in question.  The defendant was not told prior to trial that Waters had received a deal in exchange for his testimony.  

However, as noted above, both Elizondo and Waters subsequently testified at Salgado's trial that the State had, in fact, offered to release them from probation in exchange for testifying against the defendant.  See 
Salgado
, 263 Ill. App. 3d at 243.  The State does not deny that it made a deal with Elizondo and Waters in exchange for their testimony against the defendant, nor does the State deny that it failed to inform defense counsel of these deals.  Rather, the State contends in its brief that its failure to disclose such information to the defendant did not constitute a 
Brady
 violation because it was not reasonably probable that this information would have resulted in a different verdict.  The State argues that such information was not material because it was cumulative and because the identification testimony of Waters and Elizondo was corroborated by other witnesses.  The State further argues that Elizondo's testimony regarding his participation in a witness protection program was sufficient to let the jury know that he had an arrangement with the government.  We disagree.

As mentioned above, 
the State has an affirmative duty to disclose evidence favorable to a defendant.  
Brady
, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97.  We note that the State acknowledged in its answer to the defendant's pretrial motion for discovery that it had a continuing obligation to inform the defendant of any evidence that may be favorable to his defense.  By failing to inform defense counsel of the deal given to Elizondo and Waters, the State failed to comply with the mandate of 
Brady
.  

In addition, the State failed to correct Elizondo's false testimony that he had not received any promises of leniency in exchange for his testimony.  Indeed, the State remained silent during Elizondo's testimony.  The failure to correct perjured testimony also constitutes a 
Brady
 violation.  See 
Diaz
, 297 Ill. App. 3d at 372-73.  As noted above, the State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law.  See 
Diaz
, 297 Ill. App. 3d at 372.  Evidence of any understanding or agreement between a witness and the prosecution as to any future prosecution is relevant to the witness's credibility, and the jury is entitled to know about it.  
Diaz
, 297 Ill. App. 3d at 372-73.  We note that, even if the trial prosecutor did not know that Elizondo's testimony was false, a due process violation occured if there was knowledge by representatives or agents of the prosecution.  See 
Diaz
, 297 Ill. App. 3d at 373.  As the State has not denied the existence of a deal with Elizondo and Waters, we can only assume that representatives of the State had knowledge of these deals.

Having determined that a 
Brady
 violation occurred, the question becomes whether the State has demonstrated beyond a reasonable doubt that these violations did not contribute to the defendant's conviction.  See 
Diaz
, 297 Ill. App. 3d at 373. Contrary to the State's contention, we cannot say that the evidence at issue was immaterial.  While Elizondo and Waters were not the only witnesses, their identification of the defendant was crucial.  We note that, aside from Elizondo and Waters, Ramos and Ramirez were the only other witnesses who identified the defendant as one of the shooters.  However, Elizondo, Waters, Ramos, and Ramirez all admitted that they had been members of the Latin Kings, a gang that was "at war" with the defendant's gang at the time of trial.  Under the particular facts of this case, we cannot conclude beyond a reasonable doubt that the error did not contribute to the defendant's conviction.  We do not believe that the defendant received a fair trial that resulted in a verdict "worthy of confidence" (
Kyles v. Whitley
, 514 U.S. 419, 434, 131 L. Ed. 2d 490, 506, 115 S. Ct. 1555, 1566 (1995)).  
For all of these reasons, we reverse the defendant's conviction and remand the cause for a new trial. As our resolution of this issue controls our disposition on appeal, we need not address the defendant's remaining arguments.

We further conclude that the remaining evidence presented at trial was sufficient for the jury to conclude that the defendant was guilty of the charged offenses beyond a reasonable doubt.  Thus, a subsequent retrial will not subject the defendant to double jeopardy.  See 
People v. Taylor
, 76 Ill. 2d 289, 309 (1979).  Our holding, however, does not constitute an implication as to the defendant's guilt or innocence that would be binding on retrial.  See 
Taylor
, 76 Ill. 2d at 310.

The order of the circuit court of Kane County denying the defendant's postconviction petition is reversed, the defendant's conviction and sentence are reversed, and the cause is remanded for further proceedings. 

Reversed and remanded. 

INGLIS, J., concurs.

JUSTICE THOMAS, dissenting:

Absent evidence that the prosecution 
knowingly
 used false or perjured testimony, a defendant is not entitled to postconviction relief.  
People v. Brown
, 169 Ill. 2d 94, 103-08 (1995).   The knowledge requirement is satisfied if there is knowledge on the part of the representatives or agents of the prosecution.  
Brown
, 169 Ill. 2d at 103.  The defendant bears the burden of proof in a postconviction proceeding.  
People v. Griffin
, 178 Ill. 2d 65, 73 (1997).

Here, the testimony of Elizondo and Waters as to whether they were offered a deal was inconsistent in the two trials.  The trial court in the present postconviction proceeding made no finding as to whether there were deals and instead concluded that, even if there were, it would not change the outcome.  At the postconviction proceeding, the State did not admit the existence of deals, nor does it make such an admission on appeal.  I believe that, if the State's Attorney determined at the defendant's trial
 that the testimony of no deals
 was truthful, and that there were in fact no deals, then 
Diaz
, 297 Ill. App. 3d 362, would not be on point.  
Diaz
 would be distinguishable, since there the witness actually was given a deal and the State failed to disclose that fact to the defendant, despite the defendant's specific request for that information during discovery.

Since the trial court did not determine whether there was a deal in this case or whether the State knowingly used false testimony, I would remand the cause for further proceedings to allow the trial court to determine whether Elizondo and Waters were offered a deal in exchange for their testimony at the defendant's trial.  Accordingly, I dissent.