No. 2-21-0708
Order filed February 28, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-677 |
| | ) | |
| DANIEL LYN WILLIAMS, | ) | Honorable |
| | ) | Randy Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in declining to appoint new counsel after a preliminary inquiry on defendant's *pro se* claims that his defense counsel was ineffective for failing to (1) exercise peremptory strikes against two potential jurors and (2) impeach the victim with a prior inconsistent statement. Defendant failed to overcome the presumption that counsel's inaction in both instances was the product of reasonable trial strategy. First, there was no clear indication that either juror was actually biased against defendant. Second, counsel reasonably challenged the victim's credibility through a different method than impeachment with the prior statement.

¶ 2   Defendant, Daniel Lyn Williams, appeals from his convictions, following a jury trial, on

two counts of predatory criminal sexual assault of a child (PCSAC) (720 ILCS 5/11-1.40(a)(1)

(West 2010)) and three counts of criminal sexual assault (CSA) (720 ILCS 5/11-1.20 (a)(3) (West 2016)). He contends that, after holding a preliminary inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984)), the trial court committed manifest error when it did not appoint new counsel to represent him on his *pro se* posttrial claim that defense counsel was ineffective for failing to (1) use available peremptory challenges on two potentially biased jurors and (2) impeach the victim with a prior inconsistent statement directly related to one of the charges. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5     In 2018, defendant was indicted on five sex offenses stemming from acts he allegedly committed over several years against his daughter, J.J.W., who was born in June 2003. Count I charged PCSAC (720 ILCS 5/11-1.40(a)(1) (West 2010)), based on defendant's alleged act of putting his penis in J.J.W.'s anus between June 10, 2011, and June 9, 2016, when J.J.W. was under 13 years of age. Count II charged PCSAC (*id.*), based on defendant's alleged act of putting his penis in J.J.W.'s mouth between June 10, 2011, and June 9, 2016, when J.J.W. was under 13 years of age. Count III charged CSA (720 ILCS 5/11-1.20(a)(3) (West 2016)) based on defendant's alleged act of putting his penis in J.J.W.'s anus between June 10, 2016, and March 23, 2018, when J.J.W. was under 18 years of age and defendant's family member. Count IV charged CSA (*id.*), based on defendant's alleged act of putting his penis in J.J.W.'s mouth between June 10, 2016, and March 23, 2018, when J.J.W. was under 18 years of age and defendant's family member. Count V charged CSA (*id.*), based on defendant's alleged act of putting his penis in J.J.W.'s vagina between June 10, 2016, and March 23, 2018, when J.J.W. was under 18 years of age and defendant's family member. The matter proceeded to a jury trial on August 16, 2021.

¶ 6                                    B. The Jury Trial

¶ 7                                                    1. *Voir Dire*

¶ 8      At the outset of *voir dire*, the trial court advised the State and defendant that each would have nine peremptory challenges while selecting 12 jurors and 2 alternate jurors. Defense counsel ultimately used six of his peremptory challenges. At issue in this case is counsel's failure to use peremptory challenges on juror D.S. and juror T.S.

¶ 9      The first group of prospective jurors consisted of 14 individuals, including D.S. She stated that she was a legal assistant and worked in a personal injury law firm. The judge explained the relevant propositions of law, and D.S. indicated that she understood and accepted them. She also affirmed that she was comfortable voicing her opinion and working in a group.

¶ 10      When the State asked the group if "[they] or a close friend or family member [have] ever been the victim of, accused of any sexual assaults, abuse, or misconduct[,]" several prospective jurors raised their hands, including D.S.

¶ 11      D.S. disclosed that she and her sister had been victims of sexual abuse about 20 years ago; however, the abuse was never reported. She also recently learned that her daughter had been a victim of sexual abuse about ten years ago. The State asked her: "Given the fact that you just found out about that and your prior history and your sister's prior history, is that something that you would be able to, again, not forget, but to set aside and focus only on the evidence that you hear in court?" She responded, "Yes." She was also asked: "Anything about the fact that you just found out about that that would affect your ability to be fair and impartial?" She responded, "No."

¶ 12      Of the first group of 14 prospective jurors, 6 were seated, including D.S. The State struck four prospective jurors, and defense counsel struck one for cause. In addition, counsel used peremptory challenges on three prospective jurors. Before deciding whether to strike any particular juror, defense counsel conferred off the record with defendant.

¶ 13    The second group of 14 prospective jurors included juror T.S. When defense counsel inquired as to whether anyone had "an affiliation with RSAC, which is Rockford Sexual Assault Counseling, or any similar organizations[,]" the following colloquy with juror T.S. transpired:

"MR. ZIMMERMAN [(DEFENSE ATTORNEY)]: Okay. [T.S.], what's your affiliation with that group?

PROSPECTIVE JUROR [T.S.]: Not the one you mentioned, but similar. We're associated with a group called Justice & Hope which works with sexual assault victims in India. And we have a U.S. arm and my wife is a president of the arm.

MR. ZIMMERMAN: Okay. So your wife is the president of a group that has—a sexual assault counseling group affiliated with India, but its United States version of it; is that correct?

PROSPECTIVE JUROR [T.S.]: Yes. And I personally worked with a group in India as well.

MR. ZIMMERMAN: Okay. How much time do you spend with that particular organization or dealing with that particular organization?

PROSPECTIVE JUROR [T.S.]: She's on the board. I've been there for a trip and we donate.

MR. ZIMMERMAN: Okay. Is there anything about that affiliation that would cause you difficulty serving in—as a juror on this case?

PROSPECTIVE JUROR [T.S.]: I don't think so. But I'm not sure if I can answer that, honestly.

MR. ZIMMERMAN: Okay. I understand somewhat it's limited, of course, the issues with respect to the Indian judicial system and some of the problems that they have,

especially with respect to sexual assault cases. You understand that this is a totally different system, of course, and probably not many similarities; you'd agree with that?

> PROSPECTIVE JUROR [T.S.]: (Nodding).

> MR. ZIMMERMAN: Okay. With that aside or with that being said you think that you'd have any problems serving as a juror on this case?

> PROSPECTIVE JUROR [T.S.]: No.

> MR. ZIMMERMAN: Okay. Thank you for your honesty, sir."

When the second group of prospective jurors was asked whether they "donate or are *** a member of any charity or organization[,]" T.S. responded: "Justice & Hope I already talked about. Pregnancy Care Center in Rockford. Rockford Rescue Mission. Our church. A few others." Further inquiry revealed that T.S. was the CEO of a software company.

¶ 14    Seven of the second group of prospective jurors were selected as jurors, including T.S. Defense counsel struck two jurors for cause, and the State struck one. The State exercised one peremptory challenge. Defense counsel, after conferring with defendant, exercised peremptory challenges on three jurors. Defense counsel indicated the defense was willing to proceed with only one alternate juror, and the court accepted the 13 jurors.

¶ 15                            2. The State's Evidence

¶ 16    The State's evidence established that, in the early morning hours of May 24, 2018, defendant, who was 36 years old at the time, called 911 and stated that he was a pedophile and wanted to be picked up from his home on North Rockton Avenue in Rockford (the Rockton house). When the police responded to that address, defendant reported that he had been molesting his daughter, J.J.W., for years. After the responding officers spoke with defendant's wife, Dana Williams, they brought defendant to the police station for an interview.

¶ 17    J.J.W. testified that (1) she was 18 years old, (2) defendant was her father, and (3) Dana was her mother. She testified that defendant began sexually abusing and assaulting her when she was seven years old. When she was about nine years old, her family moved to Rockford, where they lived at the intersection of Oregon Avenue and Broadway (the Oregon house). While living at the Oregon house, defendant had "forced [her] to do oral." She explained that he put his penis in her mouth. She stated that she was seven years old when he first put his penis in her mouth. She testified that it also happened after they moved to a house on North Rockton Avenue (the Rockton house).

¶ 18    J.J.W. testified that defendant also "put his penis in [her] butt." When the State asked her when that first occurred, the following colloquy took place:

"Q. Okay. And how old were you, if you remember, when that first happened?

A. I think I was about 13.

Q. Okay. And do you remember if it was before you were 13 it started or after you were 13?

A. After.

Q. Okay. And where were you living when you were 13 when that happened?

A. North Rockton.

Q. And did that happen anywhere else other than on North Rockton?

A. Actually, yes, ma'am.

Q. Okay. So where else did it happen?

A. The motel we lived in before Rockton.

Q. Okay. And where was that located?

A. Traveler's Motel, if I'm not mistaken.

Q. And was that in Rockford or outside of?

A. It was in Rockford.

Q. And do you remember how old you were when you would have been staying at the motel?

A. I was just turning 13. I knew we weren't there long before we moved.

Q. Okay. So before you turned 13?

A. (Nodding).

Q. So you said that he put his penis in your butt. And did that happen multiple times or one time?

A. Multiple times."

¶ 19    J.J.W. testified further that "either the day before he turned himself in or a while before that, [defendant] tried to put his penis in [her] vagina." When defendant did this, J.J.W. started crying and asked him to stop. Defendant stopped when he was unable to insert his penis into J.J.W.'s vagina.

¶ 20    J.J.W. testified that, before defendant surrendered to the police, she had an argument with him about her then-boyfriend. She testified: "[Defendant] asked if I wanted him to turn himself in or for him to stay and I told him I wanted him to turn himself in. And we were also arguing about my ex." During the argument, defendant grabbed a belt and beat her with it. J.J.W. explained that, the day before the argument, she went to her boyfriend's house instead of going to school. Dana found her, brought her home, and then went to work. When defendant saw her, he told her that she was "walking weirdly" and assumed she had lost her virginity to a boy. Defendant beat her and then afterward allowed her to bring her boyfriend to the house so that defendant could meet him. However, after the boyfriend arrived, defendant saw text messages sent to her from the boyfriend

saying he wanted to kiss her. Defendant called Dana and asked her to "remove [the boyfriend] from the premises and that is when everything started."

¶ 21 When the State asked if J.J.W. ever talked to defendant "about wanting him to stop putting it in your mouth or in your butt[,]" she responded:

> "He actually did stop at a point in time. When we moved into [the Rockton house] I asked him and I told him I physically did not like it nor felt it was a normal thing to do and he stopped for like a couple days to a week."

J.J.W. testified that defendant would threaten to beat her or her brothers or "take away [their] birthdays" if she did not let him do this.

¶ 22 On cross-examination, defense counsel questioned J.J.W. extensively about her relationship with her then-boyfriend. She testified that he was a couple of years older than she was, that he went to a different high school, and that he had just moved back from Chicago. She also testified that defendant did not like him. She testified that she took the bus to school on the day she ran away but, after she got off the bus, she went to her boyfriend's house and did not return to school that day. Dana began calling J.J.W.'s phone and her boyfriend's phone, looking for J.J.W. Eventually, she went home. Defendant allowed her boyfriend to come over the next day. While her boyfriend was at her house, defendant saw text messages from him on J.J.W.'s phone. She denied that they were "sexual." Dana then took J.J.W.'s boyfriend home.

¶ 23 Defense counsel also asked J.J.W. about her claim that defendant was "beating [her] with a belt[ ]" and asked whether the belt left marks. She responded, "I'm pretty sure they did." Counsel asked her if she claimed to her brother and Dana that defendant had cut her legs with a knife. She confirmed that she had, but she denied reporting that defendant had heated the knife before cutting her. Counsel also asked whether she had a medical examination after she reported the sexual abuse.

She responded that she believed she went to the hospital for an examination after leaving the police station. Counsel also asked whether she told Dana, when she skipped school and was with her boyfriend, "that [defendant] had done something to [her.]" She responded that she had. Counsel then stated: "Okay. So—but she then left you with the person who you had said had done things to you; is that correct." J.J.W. responded, "Yes, sir."

¶ 24    Rockford Police Detective Kevin Gulley testified that he and another detective interviewed defendant on March 24, 2018, at the police station. The interview was video recorded. Although defendant was in the interview room from about 4 a.m. to 12 p.m., the recording only depicts the times when they were speaking with defendant and is about one hour and eighteen minutes long. The recording was admitted into evidence and played for the jury.

¶ 25    In the video-recorded statement, defendant admitted that he had been molesting J.J.W. for seven years. (At the time of the recorded statement, J.J.W. was 14 years old.) Defendant stated that he began "dry humping" J.J.W. when she was seven years old. When defendant dry-humped J.J.W., he would ejaculate in his pants. This abuse occurred when Dana was at work at night or when other family members were sleeping.

¶ 26    Defendant told the officers that he started having oral sex with J.J.W. when she was around ten years old. Defendant stated that he began to have anal sex with J.J.W. during "the last two years." When the officers asked where he was living when that started, he told them it was when he lived at the Rockton house. He stated that he had lived at the Rockton house for "about two years." When the officers asked if there "was there any anal on Oregon or was it all just on Rockton," he responded, "no, not on Oregon." Defendant said he had anal sex with J.J.W. about once a month for two years and that he also sometimes had oral sex with J.J.W. Defendant tried to put his penis in J.J.W.'s vagina on several occasions, but he never fully entered her vagina.

¶ 27    Defendant told the officers that he sexually abused J.J.W. about 20 times per year for seven years. Recently, defendant would have either oral or anal sex with J.J.W. about three times per week. Defendant stated that through the years of abuse, he would give J.J.W. choices. For example, either J.J.W. agreed to have sex with him or he would punish her, such as by grounding her or taking her phone away.

¶ 28                           3. Motion for a Direct Verdict

¶ 29    At the close of the State's case, defense counsel motioned for a directed verdict, arguing that J.J.W.'s testimony about defendant putting his penis in her "butt" did not establish anal penetration. The trial court rejected that ground, observing that defendant talked about anal sex in the video. The court continued: "I do have a problem with Count [I] because the young girl testified that the first time he put his penis in her butt was after her 13th birthday." In response, the State noted J.J.W.'s testimony that "it had happened before when they were at the hotel before she turned 13. *** And, additionally, the defendant's own statement also indicates that was happening when she was under 13 as well, too." After reviewing its notes, the court denied the motion.

¶ 30                           4. Defendant's Evidence

¶ 31    Defendant testified that he married Dana on March 4, 2005. They were in a relationship from 2000 until 2018. They had two other children in addition to J.J.W.—a son born November 1, 2000, and a son born July 31, 2005. In 2010, they moved from Virginia to Illinois. Defendant described himself as the children's primary caretaker, explaining that he and his wife had informally separated and that she was "fully employed" and "paid the bills."

¶ 32    According to defendant, on March 20 or 21 of 2018, J.J.W. ran away from home, and he discovered that she was dating a boy. Dana picked up J.J.W. from the boyfriend's house and brought her home. Defendant agreed to have the boyfriend over the next day. When defendant met

the boyfriend, he had a bad feeling about him and learned he was 17. Once defendant saw text messages from the boyfriend to J.J.W.'s phone, defendant "lost it." Dana came home, picked up the boyfriend, and took him home. After the boyfriend left, defendant and J.J.W. argued over whether she could date the boy. According to defendant, J.J.W. told defendant that "she was going to use the police against [him]." He assumed that she was referring to his use of "marijuana" or "[c]orporal punishment." When he asked her what she meant, she said that she would report him to the police based on a report that a neighbor had made to the Department of Children and Family Services a few years ago. Defendant testified that he "got upset" and decided to "call[ ] her bluff." He testified: "I said I'm going to call your mom right now. I'm going to call the police and I'm going to call your momma to get over here right now and I'm going to tell the police what really is going on."

¶ 33    Defendant testified that he called Dana and that, when she arrived at the house, he "told her that everything was true." J.J.W. and defendant's sons were present. Dana "got hysterical and said she was going to hurt herself." After calming down, Dana left to get cigarettes. Defendant's sons were upset, and he told them to calm down and that he would let Dana know the truth. He testified that he wanted J.J.W. to see that this was not something to joke about and that he wanted her to know the kind of reaction it would provoke.

¶ 34    Defendant testified that he went into another room to calm down and decided to smoke "reggies"—which he described as "a low-grade marijuana"—that he found in a bag in the parking lot of a gas station a couple of nights earlier. He believed he smoked about two grams around 11 p.m. on March 23, 2018, and he blacked out immediately after that, waking up in jail the next day. Defendant remembered nothing from when he smoked the reggies until the afternoon of March

24, 2018. He had no recollection of calling 911 or taking part in the video-recorded interview with the Rockford detectives.

¶ 35    On cross-examination, defendant testified that he and his family moved into the Oregon house in August or September of 2013. In August or September of 2015, they moved into a motel, where they stayed until August or September of 2016, when they moved to the Rockton house.

¶ 36    In closing arguments, defense counsel argued that this was a "scary [case] because any of us could find ourselves on the wrong end of a false accusation." Counsel argued that J.J.W. made a false accusation against defendant, which was "motivated by immaturity or anger at her father or some sort of vindictiveness[.]" Counsel argued that there was no corroboration for J.J.W.'s statements and that they were incredible. Counsel asserted that "even her mother didn't believe her when she made these statements." Counsel argued that if Dana had believed J.J.W., she would not have dropped J.J.W. off at home with defendant after learning of the accusations. Counsel also pointed to the absence of medical records documenting scars from alleged beatings or tears to J.J.W.'s anus. Counsel also argued that defendant's video-recorded statement showed that he was "a sleep-deprived person who had just consumed some sort of substance that he had found days earlier."

¶ 37    The jury found defendant guilty on all counts.

¶ 38                              C. Posttrial Motions

¶ 39    On September 9, 2021, defense counsel filed a motion for a new trial.

¶ 40    On October 27, 2021, defendant filed a *pro se* amended motion for a new trial raising several claims of ineffective assistance of defense counsel. He alleged, *inter alia*, the following:

> "5) The Defendant states that he informed counsel *** [that he] did not find jurors [T.S.] & [D.S.] to be strategic selections for trial during *voir dire*. ***

* * *

8) The Defendant states that [J.J.W.] told the police in statement that allegations never happened in [the] hotel but lied on [the] stand stating it did. Defendant brought it to counsel's attention, but [counsel] didn't do or say anything about it in cross-examination, which would [have] ruled out 1[ ] of 5[ ] charges."

The trial court determined that conducting a preliminary *Krankel* inquiry regarding defendant's claims was necessary.

¶ 41                 D. *Krankel* Inquiry

¶ 42     At the hearing, the trial court asked defendant, "So what was wrong with Jurors [T.S.] and [D.S.]?" The following colloquy took place:

"THE DEFENDANT: Well, [Y]our Honor, [defense counsel] had me put up paperwork stating who I felt should or should not be used as jury selection, and if I was informed of—properly what a peremptory challenge was, I would have made an objection in the courtroom stating that I wanted them to be challenged because I felt that they were biased against my case. I felt that they were not going to listen to any of the evidence and judge me properly, [Y]our Honor.

THE COURT: Okay. Well, as I said, the decision as to which jurors to keep or not to keep or where to exercise a peremptory challenge is that of the trial attorney, not a defendant. You would not have been able—allowed to assert a peremptory challenge in court if [defense counsel] didn't agree.

[Defense counsel] went above and beyond, which I commend him for doing this and I've seen him do it many times. He consults with his clients regarding jury selection to

- 13 -

get their thoughts, but in the end, it's his call, not yours. So that does not serve as a basis for the Court to grant any kind of a [*sic*] *Krankel* relief."

¶ 43    The trial court asked defense counsel whether he knew what defendant was referring to in paragraph eight of his *pro se* motion. Counsel stated:

"Yes, Judge. I believe that the complaining witness indicated various times that alleged abuse occurred over the course of years, essentially, and did that identification by way of where they were living at the time, and there was a time when they were living at a hotel. She indicated that—in her testimony that the abuse did occur at the hotel.

I believe—I didn't review her statement again prior to today, but if [defendant] indicates that in her videotaped statement she did not say that it occurred in the hotel, like I said, I didn't review that, so I don't have any reason to necessarily disagree with it. But I didn't—and I did not cross-examine her on that issue.

My purpose of cross-examination in this particular case was—was not to necessarily beat her up with regard to the specific allegations but more so to establish the evidence that I thought supported our version of what happened which is—so, for example, I questioned her about her prior relationship with her boyfriend that we contended was somewhat of the impetus for her statements. So—so I did not—I specifically did not cross-examine her on that issue."

¶ 44    The trial court concluded that defense counsel had made a strategic decision not to cross-examine J.J.W. on her statement to police that defendant did not abuse her while they lived at the motel. Defendant responded: "In her video she explained to the officer that that did not happen in the hotel whatsoever because her Mom was there all the time." Defendant argued that counsel

should have cross-examined her on the inconsistency of her statements. The court found that it was trial strategy not to press J.J.W. further on that point.

¶ 45    After considering all of defendant's *pro se* claims, the trial court found that "there is no evidence that [defense counsel] neglected his role as counsel in this particular case. He made trial strategy decisions[,] which is his role, not [defendant's] role." Thus, the court held that there was no basis to appoint new counsel. Thereafter, the court heard and denied defendant's motion for a new trial.

¶ 46                                              E. Sentencing

¶ 47    On December 1, 2021, following a sentencing hearing, the trial court sentenced defendant to consecutive prison terms totaling 60 years' imprisonment. This appeal followed.

¶ 48                                              II. ANALYSIS

¶ 49    Defendant contends that the trial court committed manifest error in declining to appoint new counsel to develop his *pro se* claims of ineffective assistance of counsel. According to defendant, the court's preliminary *Krankel* inquiry revealed possible neglect of the case based on counsel's failure to (1) use available peremptory strikes on two jurors with potential biases and (2) impeach J.J.W. with a prior inconsistent statement. Accordingly, defendant asks that we remand the matter for the appointment of new counsel and a hearing on his *pro se* ineffective-assistance claims.

¶ 50    In response, the State maintains that, after conducting a preliminary *Krankel* inquiry, the trial court properly concluded that defendant's ineffectiveness allegations failed to show possible neglect of the case. According to the State, in both claims of possible neglect, the alleged deficient performance of defense counsel constituted reasonable trial strategy. The State further asserts that, if any error occurred, it did not prejudice defendant because (1) there was no evidence that either

one of the jurors in question was biased against defendant and (2) the evidence of defendant's guilt was overwhelming. Consequently, there is no reasonable probability that counsel's alleged deficient performance affected the trial's outcome. We agree with the State that defendant's ineffectiveness allegations failed to show possible neglect of the case.

¶ 51     Under *Krankel* and its progeny, when a defendant brings a *pro se* posttrial claim of ineffective assistance of counsel to the trial court's attention, the trial court is required to conduct an inquiry into the factual basis of the claim. *People v. Jackson*, 2020 IL 124112, ¶ 97. In making the preliminary inquiry, the trial court may (1) inquire of defense counsel regarding the defendant's allegations, (2) discuss the allegations with defendant, or (3) make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations. *People v. Ayres*, 2017 IL 120071, ¶ 12.

¶ 52     At the preliminary *Krankel* inquiry, the trial court may consider the factual basis for the claim *and* its legal merits. *People v. Roddis*, 2020 IL 124352, ¶¶ 61, 70. If, after proper inquiry, the trial court determines that the claim "lacks merit or pertains only to matters of trial strategy," it may deny the defendant's *pro se* motion without appointing new counsel. *Jackson*, 2020 IL 124112, ¶ 97. If the defendant's allegations show "possible neglect" of the case, the court should appoint new counsel to represent the defendant at a hearing on his claims. *Id.* When the trial court has made a proper *Krankel* inquiry into the merits of a defendant's *pro* se ineffective-assistance claim, we will disturb the court's decision only if it was manifestly erroneous. *Id.* ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Id.*

¶ 53     The substantive law applied in a *Krankel* inquiry is the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), for ineffectiveness claims. Under *Strickland*, to prevail on an ineffectiveness claim, a defendant must demonstrate (1) that counsel's performance fell below

an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Jackson*, 2020 IL 124112, ¶ 90. The failure to establish either prong is fatal to a defendant's claim. *Id.*

¶ 54    We assess counsel's performance using an objective standard of competence under prevailing professional norms. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *Id.* "As a result, counsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable." *Id.* "Errors in trial strategy do not constitute ineffective assistance unless counsel entirely fails to conduct any meaningful adversarial testing." (Internal citations omitted.) *People v. Custer*, 2019 IL 123339, ¶ 39.

¶ 55                      A. Peremptory Challenges

¶ 56    Defendant first argues that the trial court committed manifest error in declining to appoint new counsel to develop his *pro se* ineffectiveness claims based on counsel's failure to use available peremptory challenges on jurors D.S. and T.S.

¶ 57    Defendant argues that his "concerns" about jurors D.S. and T.S. were valid. With respect to D.S., he asserts that, because she revealed during *voir dire* that she, her sister, and her daughter had all reportedly been victims of sexual assault, there existed the "potential for [D.S.] to harbor unconscious bias relating to her family background[.]" Defendant asserts that juror T.S. likewise had "the potential for unconscious bias" given his revelations that he was associated with a group that worked with sexual assault victims in India, that his wife was president of the group's U.S. arm, that he personally worked with the group, and that he donated money to the group as well as to a local pregnancy care center.

¶ 58    This court has previously recognized:

"In general, counsel's actions during jury selection are considered a matter of trial strategy, and counsel's strategic choices are virtually unchallengeable. [Citation.] Attorneys consider many factors in making their decisions about which jurors to challenge and which jurors to accept, and reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable. [Citation.]" *People v. Jones*, 2012 IL App (2d) 110346, ¶ 71.

For example, in *People v. Manning*, 241 Ill. 2d 319, 322 (2011), during *voir dire*, one of the potential jurors expressed his opinion that sex offenders should be " 'locked up for life.' " The defendant was a registered sex offender, yet his counsel did not try to remove that juror from the jury. *Id.* at 323. Our supreme court rejected the defendant's argument that counsel was ineffective for failing to exercise a peremptory challenge. *Id.* at 329. The court noted that the juror also stated that he could be fair and that there were other factors that counsel may have taken into consideration. *Id.* at 335-36. The court stated that, although some might find counsel's decision "questionable," that alone was insufficient to find counsel's decision deficient under *Strickland*. *Id.* at 336.

¶ 59    It is well-settled that, " '[t]he actual exercise of peremptory challenges properly is a matter to be handled by counsel ***.' " *People v. Brown*, 2023 IL 126852, ¶ 41 (Neville, J., specially concurring) (quoting *Tatum v. United States*, 330 A.2d 522, 524 (D.C. App. 1974)). Here, there were any number of sound, strategic reasons why counsel chose not to use peremptory challenges on D.S. and T.S. Defense counsel was able to observe D.S. and T.S. in court, to hear them answer questions, to review their personal information, and to make an informed decision, based on a variety of circumstances, including his own trial experience (and his experience before the trial

court judge), whether to use a peremptory challenge to exclude them from the jury. Significantly, D.S. indicated that nothing about her prior history would affect her ability to be fair and impartial. And although T.S. initially stated that he was "not sure if [he] [could] answer" whether his affiliation with the group in India would cause him any difficulty in serving as a juror, when asked a second time after a follow-up question, he affirmed that he would have no problem serving as a fair and impartial juror. In addition, *both* jurors confirmed that they understood the relevant propositions of law and accepted them. After evaluating both jurors, counsel may have reasonably felt a strategic need to save some peremptory challenges for possible use against prospective jurors whom counsel believed to be actually biased. Given all the circumstances, we agree with the trial court that defense counsel's decision not to strike D.S. and T.S. simply did not demonstrate possible neglect.

¶ 60    Nevertheless, relying on *People v. Maya*, 2019 IL App (3d) 180275, defendant argues that "a *pro se* allegation of strategic errors in jury selection *can* demonstrate possible neglect and necessitate the appointment of *Krankel* counsel." (Emphasis in original.) While we do not quarrel with that general principle, a review of *Maya* does not support defendant's argument that the trial court's determination was manifestly erroneous here. Instead, it compels the opposite conclusion.

¶ 61    In *Maya*, the defendant was charged with first-degree murder, attempted first-degree murder, and unlawful use of a weapon by a felon. *Id.* ¶ 3. During jury selection, Kevin McGrath— a prospective juror—indicated that he worked as a correctional officer for the Will County Sheriff's Department. *Id.* ¶ 4. Defense counsel did not inquire about McGrath's profession or seek to dismiss him. *Id.* The jury, which included McGrath, found defendant guilty on all counts. *Id.* ¶ 5. The defendant filed a *pro se* posttrial motion raising numerous ineffectiveness claims, including a claim that counsel was "ineffective for failing to move to strike a juror who worked as

a correctional officer and with whom the defendant had engaged in 'several confrontations.' "*Id.* ¶ 8. The trial court did not address the defendant's *pro se* arguments. On appeal, the matter was remanded for a *Krankel* hearing. *Id.* ¶ 10.

¶ 62　At the *Krankel* hearing, the defendant stated as follows concerning his claim that counsel was ineffective for failing to strike McGrath:

> " '[Defense counsel] *** allowed me to have a tainted jury which had a correctional officer from the housing unit where I was housed named Kevin McGrath, who I had several altercations with who would tell other inmates about my case. Since my case was against a minor and—and two females, he would tell other inmates in hopes to have them attack me and who would come to my cell and verbally insult me. Before trial he knew who I was by me having a high profile case and eventually working on my *** POD [unit] nine times before trial ***. After I informed [defense counsel] about him, he responded telling me, "Oh, well, we rather have him rather than anyone else or the venireman who's a State's Attorney." In another occasion, after I informed him I didn't want him on my jury, he told me, "Well, he said he was going to be fair." This [correctional officer] clearly had hatred towards me so of course he was going to find me guilty.' " *Id.* ¶ 11.

Although the court examined defense counsel on another claim, it asked no questions related to McGrath or the jury's composition. *Id.* ¶ 13. The court found that the defendant failed to show possible neglect and declined to appoint new counsel. *Id.*

¶ 63　On appeal, the Third District began by rejecting the notion that "claims of ineffectiveness are *per se* and absolutely barred where they touch on a matter of possible trial strategy." *Id.* ¶ 28. It stated "that, under certain circumstances, even a claim of ineffective assistance of counsel that potentially relates to trial strategy may demonstrate possible neglect of the case, warranting the

appointment of counsel and further posttrial proceedings." *Id.* ¶ 30. The court then turned to the defendant's allegations. The court acknowledged that, although the primary fact of McGrath's employment as a deputy correctional officer in Will County was confirmed in the record, his allegations that McGrath worked in defendant's pod, harassed defendant, and engaged in several confrontations with him were not. *Id.* ¶ 32. Nevertheless, the court noted that those allegations stood unrebutted as of then. *Id.* ¶ 34. The court further noted that the trial court asked no questions of defense counsel. The court concluded:

> "If the defendant's factual allegations are true, the seating of McGrath on the jury that eventually found the defendant guilty shocks the conscience. The claims that McGrath had altercations with the defendant in jail and induced other inmates to harass the defendant by sharing details of his case demonstrate *actual* malice and bias. Trial before a biased jury is structural error and requires automatic reversal. [Citation.] It is difficult to discern any potential strategy defense counsel might have for allowing a juror with *demonstrated bias* toward his client to serve on a jury.
>
> We make no finding as to the credibility of the defendant's factual allegations. However, given the serious nature of the allegations, the absence of any explanation from defense counsel as to the facts and circumstances surrounding the allegations, and the fact that the record shows that McGrath was a Will County correctional officer, we hold that the circuit court's determination that the defendant failed to demonstrate possible neglect of the case was manifestly erroneous. Accordingly, we find that further proceedings on the defendant's posttrial claims of ineffectiveness are warranted under the circumstances presented in this case." (Emphases in original, added, and omitted.) *Id.* ¶¶ 35, 36.

¶ 64 Although *Maya* makes clear that "*under certain circumstances*, even a claim of ineffective assistance of counsel that potentially relates to trial strategy may demonstrate possible neglect of the case," those circumstances are not present here. (Emphasis added.) *Id.* ¶ 30. Unlike in *Maya*, where the defendant's claims, if true, demonstrated "*actual* malice and bias," defendant here does not claim that he knew either juror or that he had any interaction with them that would reveal "*demonstrated* bias." (Emphasis in original and emphasis added.) *Id.* ¶ 35. Instead, defendant claims only that T.S. and D.S. have the "*potential* for *unconscious* bias." (Emphasis added.) Defendant's claims are nothing more than speculation. See *People v. Nicholson*, 218 Ill. App. 3d 273, 286 (1991) ("[M]ere speculation alone is insufficient to demonstrate a juror's bias.").

¶ 65 Accordingly, because defendant failed to demonstrate possible neglect of the case, the court did not manifestly err in declining to appoint new counsel.

¶ 66                                   B. Impeachment

¶ 67 We next consider defendant's *pro se* allegation that counsel was ineffective in failing to impeach J.J.W. with her prior statement to the police that defendant did not force her to perform oral sex at the motel. This act was the basis for count I. According to defendant, counsel's failure to impeach J.J.W. with her prior statement shows possible neglect of the case.

¶ 68 Counsel's decision not to impeach J.J.W. was a matter of trial strategy. See *People v. Salgado*, 263 Ill. App. 3d 238, 246 (1994). As such, it was immune from attack under *Strickland* and its progeny unless it was so obviously incorrect or misguided as to amount to no strategy at all. See *Custer*, 2019 IL 123339, ¶ 39. "When assessing the importance of the failure to impeach for purposes of a *Strickland* claim, '[t]he value of the potentially impeaching material must be placed in perspective.' " *Salgado*, 263 Ill. App. 3d at 247 (quoting *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989)).

¶ 69    Here, at the preliminary *Krankel* hearing, counsel did not deny the substance of defendant's allegation or its relevance to the issue. Counsel explained, however, that his strategy in cross-examining J.J.W. was not to "beat her up with regard to the specific allegations but more so to establish the evidence that [he] thought supported [their] version of what happened." He further explained that he "questioned [J.J.W.] about her prior relationship with her boyfriend[,] [which the defense] contended was somewhat of the impetus for her statements." Indeed, counsel's strategy was made clear in closing arguments. Counsel argued that J.J.W. falsely accused defendant out of vindictiveness. Counsel asserted that her allegations were incredible, pointed out the absence of corroborating evidence, and suggested that J.J.W.'s own mother did not believe her story. Counsel further pointed out that defendant's video-recorded statement showed that he was "a sleep-deprived person who had just consumed some sort of substance that he had found days earlier."

¶ 70    Nevertheless, defendant argues that nothing about counsel's strategy was incompatible with impeaching J.J.W. about the time frame of the conduct alleged in count I. Defendant contends that, by impeaching J.J.W., counsel would have weakened the State's case. J.J.W. testified at trial that defendant first performed anal sex on her *before* she turned 13, while they were temporarily living at a motel. J.J.W. turned 13 in June 2016. Defendant testified they moved from the motel to the Rockton house in August or September of 2016. In his recorded statement, defendant stated that he first performed anal sex on J.J.W. when they were living at the Rockton house, which would have been *after* J.J.W. had turned 13. To be sure, if counsel had impeached J.J.W. with her prior inconsistent statement to police that defendant had never abused her while they were living at the motel, that evidence, taken with defendant's recorded statement that he performed anal sex on J.J.W. only after they moved to the Rockton house, *could* have led the jury to conclude that

J.J.W. was over 13 when the first anal sex act occurred. Thus, the impeachment *might* have resulted in a not-guilty verdict as to count I.

¶ 71    However, we cannot say that counsel's strategy not to cross-examine J.J.W. on the specifics of her allegations, even if it had the potential to defeat one of the charges, was so obviously incorrect or misguided as to amount to no strategy at all. Cross-examining a young sexual abuse victim too aggressively would inevitably stir the juror's sympathies. Although impeaching J.J.W. with the prior inconsistent statement would arguably have provided some support for counsel's theory that J.J.W. was lying about all the allegations, it would also have brought attention to the specifics of defendant's *admission* about sexual penetration. It was not unreasonable for counsel to be reluctant about bringing further attention to those allegations. Indeed, even if counsel had impeached J.J.W. with her prior inconsistent statement, the jury could still have found her trial testimony credible and more believable than her prior statement. See *People v. Young*, 133 Ill. App. 3d 886, 892 (1985) ("It is the province of the trier of fact to determine the effect of a prior inconsistent statement upon the credibility of a witness, since an inconsistent extrajudicial statement does not, *per se*, destroy the probative value of that witness'[s] testimony; the trier of fact may accept the credibility of the witness notwithstanding the impeaching inconsistent statement.") We note that J.J.W.'s trial testimony—that defendant performed anal sex on her before she was 13—was consistent with defendant's additional statement to the officers that he began having anal sex with J.J.W. during "the last two years," because J.J.W. would have been 12 in March 2016.

¶ 72    Given the circumstances, we cannot dismiss as misguided counsel's decision not to "beat [J.J.W.] up" on the precise dates of the anal penetration. Instead, counsel reasonably sought to lay the groundwork for suggesting that J.J.W. had a motive for fabricating *all* of the charges. In that

light, counsel's decision was strategy, not neglect. Thus, the court did not manifestly err in declining to appoint new post-trial counsel or deny defendant's *Krankel* motion altogether.

¶ 73                                    III. CONCLUSION

¶ 74     In sum, we reject defendant's ineffective-assistance claims regarding jury selection and impeachment of the complaining witness. After carefully examining the record, we agree with the trial court that counsel used sound professional judgment in both instances. Thus, for the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 75     Affirmed.