2025 IL App (1st) 221722-U

SECOND DIVISION
January 21, 2025

No. 1-22-1722

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 00CR13555 |
| | ) | |
| ANTOINE SMITH, | ) | Honorable |
| | ) | Anjana Hansen, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's denial of defendant's postconviction petition after an evidentiary hearing was not manifestly erroneous because the evidence did not establish that the State failed to correct inaccurate testimony in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

¶ 2    Defendant Antoine Smith appeals from the trial court's denial of postconviction relief following a third stage evidentiary hearing. Specifically, he argues that the trial court's denial of his postconviction petition was manifestly erroneous because he established by a preponderance of the evidence that the State violated his right to due process by failing to correct inaccurate testimony from an investigating detective.

¶ 3    Following a jury trial, defendant was convicted of first degree murder and attempted armed robbery arising from the April 13, 1998, murder of James Pappas at a Citgo gas station, located at 1925 Green Bay Road in Evanston, Illinois (Citgo). The following facts, taken from defendant's direct appeal, are discussed to the extent necessary to resolve the issues on appeal. See *People v. Smith*, 362 Ill. App. 3d 1062 (2005).

¶ 4    At trial, Dawn Lockhart testified that at approximately 6:35 a.m. on April 13, 1998, she and her mother stopped at the Citgo while driving to work. Lockhart went into the store but did not see the cashier. When she looked behind the cashier's counter, she saw defendant bent down on his knees moving his fist up and down while holding something in his hand, hitting a man who was lying on the floor. At some point, she and defendant looked at each other, and then Lockhart ran back outside to her mother's car. The man had "a nylon" across part of his face, but she could see his eyes, upper cheekbones, and forehead.

¶ 5    Lockhart recognized defendant because she had seen him "around" for about a year prior to April 1998. She was not friends with defendant, and may not have known his name, but she "knew his face" from the streets. Lockhart identified defendant in court as the man she recognized in the Citgo. As she was leaving, Lockhart saw a Hispanic couple drive into the gas station, and she motioned for them not to enter the store.

¶ 6    After they left the Citgo, Lockhart and her mother drove towards Emerson Street and she saw defendant running across from where they were driving. She described his running as "zigzagging" because defendant was "cutting" across the street and through a building. She saw a police officer and stopped to report "what had happened."

¶ 7    Lockhart went to the police station later that day and looked through various mug books but did not see defendant's photo. She described the man she had seen to a sketch artist but

2

testified that she did not cooperate with the making of the sketch or the investigation because she "really did not want to be involved with any of this." On April 22, 1998, Lockhart viewed an in-person lineup at the Evanston Police Department. She testified that defendant was present in the lineup, but she did not identify him because she was nervous and scared. When she saw defendant, she told the police officers in the room that she "wanted to go home," she "wouldn't cooperate at all," and she would not "tell them anything."

¶ 8 Almost two years later, in March 2000, Detectives Glenn Cannon and James Hutton went to Lockhart's house and asked her to "get involved again" with the case. While she initially refused to assist them, Lockhart went to the Evanston Police Department about a week later but she left before speaking with any investigating officers. Lockhart eventually returned to the police station and agreed to cooperate. Lockhart viewed a series of photographs and identified defendant as the man she had seen at the gas station. She also identified defendant in a photograph of the lineup that had been held on April 22, 1998.

¶ 9 Jose Cruz Torres testified that at approximately 6:35 a.m. on April 13, 1998, he was driving with his wife and pulled into the Citgo. As he was walking toward the door, two women came out "in a hurry." One of the women, whom he eventually learned was Lockhart, looked afraid and signaled to him not to enter the store. The women then got into a car and drove away. Shortly after, a man in "black pants, black [Nike] shoes, black sweatshirt with a hoodie and blue ski mask" exited the store. Because he was wearing a ski mask, Torres could only see the man's eyes. The man was wearing black gloves and looked like he was "hiding something" in his right hand. He looked at Torres and then ran across Green Bay Road toward Asbury Street. Torres went inside the store and saw the victim lying against a file cabinet in the cashier's area. Torres ran outside and eventually flagged down a police officer he saw driving past the gas station.

3

¶ 10    Dean Hasapis, owner of the Citgo gas station and Pappas's godfather, testified that there was a safe located in the washroom where he would put the money earned each day. Following the weekend sales, he would retrieve the money from the safe every Monday. The safe was opened with a combination and then a key was needed to open a second compartment. Hasapis was the only person with a key to the safe, but both he and Pappas knew the combination. No money was taken during the attempted armed robbery. Hasapis also testified that the video cassette recorder (VCR) for the security camera at the store was not working. He had told his employee Robert Fomond to fix it, but on the day of the murder it had not been repaired. The security cameras were working but were unable to record without the VCR.

¶ 11    Jimmy Tillman testified that at a little before 7 a.m. on April 13, 1998, he was walking to his daughter's house, located approximately five blocks from the Citgo. Tillman was walking north on Green Bay Road when he saw defendant wearing dark clothes and walking southbound on Green Bay Road away from the Citgo gas station. Tillman knew defendant and crossed the street to talk to him. Tillman made a gesture to speak with defendant and say hello, but as he walked past defendant, defendant gestured at Tillman and continued walking. As Tillman continued northbound, he looked over his shoulder toward defendant, and saw defendant cross the street, turn around, and then head north toward the Citgo. Later, Tillman heard about the attempted robbery and murder at the Citgo gas station. In January 2000, Tillman identified defendant as the man he had seen on the morning of the murder.

¶ 12    Detective Cannon testified that in April 1998 he became involved in the investigation of the murder and attempted armed robbery of Pappas. On April 21, 1998, he prepared a search warrant for defendant's residence and was present when the search warrant was executed. The officers recovered some clothing items, including a pair of jeans and a "couple of sweatshirts."

¶ 13    On April 22, 1998, Detective Cannon was present when Lockhart viewed a physical lineup. He described the lineup procedure at the Evanston Police Department. It was conducted in two separate rooms, with the viewing area separated from the participants by a pane of one-way glass. Detective Cannon was standing in the hallway outside of the rooms where he "could see both rooms." According to the detective, Lockhart was "convulsing," "violently shaking, crying, sobbing," and "clutching" Evanston Police Chief Frank Kaminski's arm while viewing the lineup. She repeatedly said she wanted "it to be over" and that she wanted to leave. When Cannon realized that they "weren't going to get anywhere that evening," he stopped the lineup.

¶ 14    Detective Cannon conducted the photo lineup in January 2000 in which Tillman identified defendant.

¶ 15    In March 2000, Detective Cannon and Detective Hutton went to Lockhart's home and asked her if she remembered anything she had not previously told them about the murder. She said she did not remember anything new. On April 13, 2000, Cannon met with Lockhart at the police station. She told him she knew who killed the victim and wanted to identify him. Lockhart then identified defendant from a photo array.

¶ 16    Robert Fomond testified that he was currently living in the witness protection program at the Cook County jail. In exchange for his testimony, as part of an agreement with the State's Attorney's office, the murder charges against him had been dismissed and he was to serve an 11-year prison sentence for attempted armed robbery.

¶ 17    Fomond started working at the Citgo gas station in 1995 and returned to the job after he was released from prison in 1997. Around that time, he became friends with defendant. When he was working at the Citgo, if the money in the cash register was over $100, he would place it in an envelope and deposit it in the safe. He explained that there was a slot in the top where the

envelope would be dropped, and then he turned a mechanism to drop the envelope into the bottom of the safe. He testified that Hasapis normally opened the store on Mondays and was the only one with a key to the safe. Fomond would occasionally help Hasapis on Monday mornings and take the deposit to the bank.

¶ 18    On April 10, 1998, Fomond saw defendant at a bar and, after discussing how they were both in need of money, they decided to rob the gas station. Fomond told defendant where the safe was located and that the best time to commit the robbery was a Monday morning between 10 and 11 a.m. Defendant initially suggested a fake robbery in which he would strike Fomond and take the money. Fomond said no because he did not "want to be involved" in the execution of the robbery. They discussed their division of the money and Fomond would receive between $1,000 and $2,000. Defendant told Fomond that he would "get one of them things" to commit the robbery, which Fomond took to mean a gun. Defendant also said he would wear a mask and dark clothing so that he could not be identified. On April 11, 1998, defendant went to the gas station while Fomond was at work. Defendant noticed a security camera and asked about Fomond it. Fomond told defendant the VCR was broken and had been taken to be repaired.

¶ 19    On April 13, 1998, at about 7:30 a.m., a detective woke Fomond up and told him that a murder had occurred at the gas station. Fomond went to the police station but did not tell the police about his plan with defendant to rob the gas station. At approximately 4 p.m. that day, Fomond saw defendant while driving. They flagged each other down and defendant told Fomond that "it didn't go down right," referring to the robbery. Defendant told Fomond that "he got into a tussle with the guy, and – and he had to give it to him," which Fomond understood to mean that defendant shot the victim. Defendant reassured Fomond that he "didn't leave them nothing to go on." The police brought Fomond in for questioning multiple times over the next several days.

Fomond, still, did not disclose his plan with defendant to rob the gas station. Instead, he told the police about an incident when he allowed a man to use a stolen credit card at the Citgo. Fomond also met with defendant on a few occasions and defendant told Fomond not to worry. On April 21, 1998, the police picked up Fomond again and told him the credit card story "wasn't matching out" and they did not believe him. At that point, Fomond told the police about his conversation with defendant on April 10, 1998, and their meetings after the murder.

¶ 20    Assistant State's Attorney (ASA) Jonathan Lerner testified about the written statement Fomond gave him on April 21, 1998, which he read to the jury. Fomond's statement was substantially similar to his trial testimony, detailing his employment at the Citgo, his conversation with defendant on April 10, 1998, about robbing the Citgo, and the aftermath of Pappas's murder.

¶ 21    The State called the medical examiner who detailed Pappas's injuries. The victim suffered blunt trauma injuries, including a large laceration on his head that "went completely through the full thickness of his scalp," which caused a hemorrhage in his brain, as well as a skull fracture. Pappas also suffered blunt trauma injuries to his back as well as a gunshot wound in his "left back." The path of the bullet went through Pappas's left lung and perforated the left ventricle of his heart. Pappas's cause of death was a gunshot wound to his back with the blunt head trauma contributing to his death.

¶ 22    The State rested and the court denied defendant's motion for a directed verdict.

¶ 23    The defense called Officer Christine Bell who testified that she interviewed Lockhart at the Evanston Police Department at approximately 9:30 a.m. on the morning of the murder. Lockhart described the man she saw at the Citgo as wearing a black sweatshirt-type hooded jacket, dark pants, and a black nylon-type hat on his head. The nylon hat had a knot tied on top

7

and band with some writing on it. The band was pulled over the man's eyes and rested on the lower part of his nose. Lockhart was unsure of the man's shoes and whether he was wearing gloves, but said he was dark skinned, possibly black. On cross-examination, Officer Bell testified that Lockhart was "very nervous," she could not sit still or catch her breath and was crying. She would describe Lockhart's behavior as reluctant. Lockhart gave short answers to Officer Bell's questions.

¶ 24    The defense called Lieutenant Richard Weiner who also interviewed Lockhart. He testified that on the day of the murder, Lockhart gave him a description of the man she had seen, but she did not describe any of the offender's facial features. Based on her description, he generated a computer composite of the suspect offender. Lockhart told Lieutenant Weiner that the sketch looked like the suspect. Lieutenant Weiner said that throughout the process Lockhart was "quite nervous, agitated, kept wanting to get up, have a cigarette, stand up, sit down, stand up, sit down."

¶ 25    The jury found defendant guilty of first degree murder and attempted armed robbery. The jury further found that the murder of Pappas occurred during the commission of attempted armed robbery and Pappas's death was the result of exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court subsequently sentenced defendant to a term of natural life imprisonment.

¶ 26    On direct appeal, defendant raised several arguments, including that the trial court erred in denying his request to call Lockhart during his motion to suppress her identification testimony and that the evidence at trial was insufficient to support either conviction. *Smith*, 362 Ill. App. 3d at 1066-67. Another panel of this court affirmed defendant's convictions and sentence. Following a supervisory order from the supreme court, the appellate court vacated that opinion

and reconsidered the case in light of the supreme court's decision in *People v. Herron*, 215 Ill. 2d 167 (2005). Thereafter, defendant's convictions and sentence were affirmed. *Smith*, 362 Ill. App. 3d. at 1067.

¶ 27 Defendant filed his *pro se* postconviction petition in 2006 and alleged, in pertinent part, that Detective Cannon falsely testified that he had been present for the April 1998 lineup and observed Lockhart behaving nervously. Defendant argued that Detective Cannon could not have been present for the lineup because he was executing a search warrant at defendant's apartment on the same day, April 21, 1998, at the same time. Defendant attached police reports from both Detectives Cannon and Hutton. The police report written by Detective Cannon stated that he, along with Sergeant McConnell, had prepared a search warrant for defendant's residence. It was signed by a judge on "04/21/98 at 1740 hours," and then the search warrant was executed "at about 1900 hours." The police report written by Detective Hutton stated that a lineup was conducted on "21APRIL98 at approximately 1910 Hrs" with Detective Stonequist, Sergeant Alan Hollander, and Chief Kaminski present for the lineup.

¶ 28 Defendant's petition advanced to the second stage of review and an attorney from the public defender's office was appointed to represent defendant. Postconviction counsel did not amend defendant's petition. On August 6, 2010, the State filed a motion to dismiss the petition, alleging that: (1) the petition was untimely filed on April 26, 2007; (2) defendant's claims were otherwise barred by the doctrines of *res judicata* or waiver; and (3) defendant did not receive ineffective assistance of appellate counsel. The trial court later dismissed defendant's petition.

¶ 29 On appeal from his second-stage dismissal, this court concluded that the trial court had "erred when it failed to consider defendant's request to proceed *pro se*." *People v. Smith*, 2014

IL App (1st) 121657, ¶ 44. We vacated the dismissal of defendant's petition and remanded for further second stage proceedings. *Id*.

¶ 30    Defendant, through counsel, filed an amended postconviction petition in September 2021 and alleged that: (1) he was denied his right to a fair trial due to the State's multiple violations of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) he received ineffective assistance of counsel; and (3) the cumulative effect of the *Brady* violations and the ineffective assistance of counsel prejudiced him and violated his constitutional rights. Specifically, defendant argued in regard to the *Brady* claim that "the prosecution failed to intervene and correct false testimony from law enforcement, chose not to discover or produce favorable evidence to [defendant], did not disclose the coercive tactics against witnesses during the investigation, and intentionally blocked the defense from discovering relevant, impeaching evidence about a key witness." Defendant's petition was further amended in June 2022 to include a claim of actual innocence supported by an affidavit from defense investigator George Gergis concerning his interview with Jemarcus Jones relating to the attempted armed robbery and murder committed at the Citgo.

¶ 31    The trial court conducted a third-stage evidentiary hearing on defendant's petition in September 2022. The following evidence was presented at the hearing.

¶ 32    Officer Bell testified that she did not have an independent recollection of this case and relied on her police report detailing her interview with Lockhart on April 13, 1998. Lockhart described the offender as wearing a sweatshirt-type hooded jacket, dark pants, and a nylon-type hat under his hood. The nylon hat had writing on it, but Lockhart could not remember what the writing was. She was unsure of the offender's shoes or if he was wearing gloves. She described the offender's features as "very keen or prominent" and he was dark-skinned, possibly black. He looked "vaguely familiar," but Lockhart did not identify anyone from photographs.

¶ 33    Officer John Huinker provided similar testimony regarding Officer Bell's interview with Lockhart on April 13, 1998. He testified from a police report about Lockhart's description of the offender. Lockhart told the officers that the offender was wearing a sweatshirt-type hooded jacket, dark pants, and a nylon-type hat under his hood. The nylon hat had writing on it, but Lockhart could not remember what the writing was. She was unsure of the offender's shoes or if he was wearing gloves. She described the offender's features as "very keen or prominent," he was dark-skinned, possibly black, and he looked "familiar." The officers showed photobooks to Lockhart but she did not make an identification.

¶ 34    Detective James Hutton testified that in April 1998, he was a detective with the Evanston Police Department. Detective Hutton referred to a police report he wrote on April 22, 1998, "for a lineup that was held on the 21st of April of '98" at 7:10 p.m. with Lockhart as the witness. The lineup room was separated from the prisoner processing area and the viewing room by a metal electronic door. The report listed Detective Stonequist, Sergeant Hollander, and Chief Kaminski as present in the viewing room for the lineup. No identification was made that day. When asked if it was possible for someone to see both where the lineup participants were and where the witness was if the metal door was held open, Detective Hutton responded, "best of my knowledge, you would have to move either holding the door inside the viewing room or to the other side to view the lineup room. I don't think you could do both at the same time."

¶ 35    Chief Frank Kaminski testified that he was the chief of the Evanston Police Department in April 1998. He "vaguely" remembered the shooting of Pappas at the Citgo because it had "been 24 years." Chief Kaminski did not recall being present for the lineup viewed by Lockhart on April 21, 1998, but agreed that if Detective Hutton's police report stated he was present, then he "would assume the report is correct." He acknowledged that although the report was signed

11

by Detective Hutton, it did not list Detective Hutton as present in the viewing area for the lineup. Nor did the report list if any police officers were present with the lineup participants. Chief Kaminski had no independent recollection of his interaction with Lockhart during the lineup.

¶ 36    Detective Cannon testified with the aid of his police reports to "refresh [his] recollection. According to his police report, on April 21, 1998, he helped prepare a search warrant for defendant's home which was executed at 7 p.m. that night. His recollection was that he "was not there for the actual search warrant itself." He prepared the search warrant and brought it before a judge, but he did not believe he was there for the execution. Cannon admitted that he may have been there, but he did not recall anything specifically since it was "24 years ago." After reviewing his prior trial testimony in which he stated he was present, Detective Cannon responded that it did not refresh his recollection but if that was what he "said at the original trial, then that's the case."

¶ 37    Detective Cannon also reviewed the police report about the lineup. When asked if the lineup occurred at the same time as the execution of the search warrant, the detective answered, "Apparently." The detective did not recall being present at the lineup. After reviewing his trial testimony, Detective Cannon stated that he would have had a better recollection about his observations during the lineup viewed by Lockhart at the time of the trial.

¶ 38    Officer Patricia McConnell testified that in April 1998, she was an officer with the Winnetka Police Department and was the report review supervisor. She worked with Detective Cannon but did not have a specific recollection of this investigation. Officer McConnell acknowledged a report written on April 22, 1998, indicating that she worked with Detective Cannon to prepare a search warrant on April 21, 1998, and testified that if the report stated she did, then she was "sure" she did. She also agreed that the report stated that a judge reviewed and

12

signed the search warrant on April 21, 1998. When asked about when the search warrant was executed, Office McConnell responded, "Well, it doesn't say it was executed on April 21st. It says it was executed at about 19:00 hours, but it doesn't specify the date."

¶ 39    Abraham Hill testified that in April 1998, he was employed at Haliburton Funeral Chapel, located at 1317 Emerson in Evanston. On April 13, 1998, he arrived at work, turned on the lights, and did his "regular routine" which included walking to the Citgo to purchase a pack of cigarettes and scratch-off lottery tickets. He walked through an alley from the funeral home to the Citgo. On the way, he stopped at a pay phone to call his mother when he heard two to three gunshots. He dropped the phone and ran back to the funeral home. He did not contact the police about what he heard.

¶ 40    Hill was questioned multiple times by the police. When he told them what he did the morning of the April 13, 1998, the officers "didn't want to believe it." He told them that as he was approaching the gas station, he saw "a car sitting at the gas station" and it looked like someone was sitting in the car but he could not tell if the person was male or female or their race. He did not pay attention to it and went to the pay phone. On the third day of questioning, Hill decided he was "just going to tell them something that they are gonna want to hear and let me go." Hill then told the officers that "Somebody came out of the Citgo station, jumped in the car and went straight down Green Bay Road," but this statement was not true. He lied because the officer did not believe what he had told them previously. When he was questioned the next day, Hill told the officers that what he said about someone exiting the Citgo and getting in a car was not true. The officers then placed Hill under arrest for obstruction of justice and he was later prosecuted. He served time but testified that his parole officer told Hill "they vacated everything."

13

¶ 41    George Gergis testified that he was a legal investigator and was referred to defendant's attorneys by another investigator. He interviewed defendant's cousin Jemarcus Jones in July 2016 for approximately two hours. Jones was on parole for "a sexual charge regarding a minor" at the time of the interview.

¶ 42    Jones was a member of the same street gang as defendant and Fomond. In Gergis's opinion, Jones had "firsthand knowledge of what had happened" and was "involved in the event." According to Gergis, Jones planned and committed the robbery at the Citgo with Fomond. During a scuffle with Pappas, Jones became trapped in the partitioned box where the cash register was located. When Pappas attacked Jones with a fire extinguisher, Jones fired his shotgun. Jones fired a single shot because he only had one bullet.

¶ 43    Gergis conceded that Jones did not admit to the shooting but referred to the "young man" as the shooter and made references to himself as the "young man," including giving his own date of birth and first person pronouns. Gergis admitted that he had not seen the police reports and did not attempt to verify the information given to him by Jones. Gergis did not know if Jones told him anything that was not previously brought out at trial or reported in the news. He did not "know any background or detailed information about the case."

¶ 44    In October 2022, defendant file a memorandum in support of his petition and reasserted his claims of a violation of *Brady* by the State, ineffective assistance of counsel, and actual innocence based on Jones's statements to Gergis.

¶ 45    In November 2022, the trial court denied defendant's petition for postconviction relief and entered its findings on the record. The court made the following findings regarding defendant's *Brady* claim.

"So first of all, let me address the arguments of Brady violations. First, the

Petitioner contends that the Prosecution failed to produce evidence and failed to correct the record; in that, the Prosecution knew or should have known that Detective Cannon was lying in his testimony. The Petitioner looks to Detective Cannon's testimony at trial where he said he was present for a lineup where the witness Dawn Lockhart was present and at the same time he was executing a search warrant per a police report he authored.

Petitioner argues that [the prosecutor] knew or should have known of this discrepancy but that argument ignores the fact that Petitioner was also privy to the same information. Defendant had the reports regarding the search warrant and lineup prior to trial and there is no evidence to show that any evidence was not tendered to the defendant prior to trial.

And in looking at the evidence – all the evidence on this case including the trial testimony in Petitioner's argument, Petitioner also ignores the trial testimony. When Detective Cannon testified on October 12, 2022, during the evidentiary hearing, he was confronted with his trial testimony about whether or not he was present for the search warrant. Detective Cannon acknowledged that he said -- that if he said at the original trial that he was present, then that was the case. However, Counsel left out a few pertinent questions in the trial transcript when Detective Cannon was confronted by that testimony and questioned about being present for the execution of the search warrant. ***

During the trial Detective Cannon was asked about two separate dates, the lineup viewed by Lockhart on 4/22/98 and the search warrant execution on 4/21/98 specifically asked the question at trial directing his attention to the day

before the lineup. Lockhart also testified that she viewed the lineup on 4/22/98. Even though Petitioner's Exhibit Number 2 -- and I believe that was the exhibit presented at the evidentiary hearing which is the report of the lineup is dated 4/22/98. It lists the date of the viewing as 4/21/98 which is the same for Petitioner's Exhibit Number 3 the report of the search warrant execution report also dated 4/22/98 with an execution date of 4/21/98. So taking that testimony at trial about the dates and looking at those two reports and exhibits it leads me to believe that when considering the trial testimony that the discrepancy in the dates can be attributed to a typo in light of the trial testimony. I find that Detective Cannon was not lying about his whereabouts which is corroborated by Lockhart's testimony of when she viewed the lineup.

In arguing that the evidence against the Petitioner relied heavily on Detective Cannon's testimony, Petitioner ignores all the other evidence presented at trial. Dawn Lockhart herself testified at trial ***. She testified why it took her two years to come forward and identify defendant as well as why she didn't identify him in April of 1998.

Officer Bell testified that when Lockhart came to view the initial lineup in April of 1998 she was nervous and crying. Lieutenant Weiner *** also testified that Lockhart was nervous, agitated and constantly going from sitting to standing. ***

Essentially Petitioner is attacking the credibility of Detective Cannon and arguing if his credibility is unreliable and so is Lockhart's ability to identify the defendant. Again, this ignores the evidence presented at trial which includes

16

Lockhart's testimony in which a jury assessed her credibility and found the Petitioner guilty.

[P]ost-conviction proceedings are not a way to retry the case and thereby reassess all the credibility of the witnesses which is what Petitioner is asking I do here. People versus Vale 46 Ill.2d, 589.

In addition, on direct appeal Defendant argued Lockhart's identification was unreliable, and the Appellate Court found that there was other testimony of her state of mind other than Detective Cannon. The Appellate Court upheld Defendant's conviction finding there was sufficient evidence to support his conviction."

¶ 46    The court further found that defendant could have raised this *Brady* claim on direct appeal, and the issue was forfeited. The court found that "much of what the Petitioner has argued with regards to Brady violations has no merit as evidence was produced to the Defense." The court also denied defendant's claims of ineffective assistance of counsel and actual innocence.

¶ 47    This appeal followed.

¶ 48     Defendant argues that at the hearing he established by a preponderance of the evidence the State violated his right to due process under *Brady* by failing to correct Detective Cannon's false testimony and the trial court's ruling to the contrary was manifestly erroneous. The State maintains that the evidence does not support defendant's *Brady* claim and the trial court properly denied defendant's petition. Defendant has not challenged the two remaining claims presented to the trial court on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not

17

argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 49    The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-8 (West 2020)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2020); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Id*. at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). This appeal comes to us following a third-stage evidentiary hearing under the Post-Conviction Act.

¶ 50    At the evidentiary hearing, "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. At the evidentiary hearing, the defendant bears the burden of proof to show a denial of a constitutional right by the preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. Since the trial court makes factual and credibility determinations, the court's decision will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. " 'Manifest error' is error which is clearly plain, evident, and indisputable." *People v. Taylor*, 237 Ill. 2d 356, 373 (2010). "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98. "The burden of convincing a reviewing court that a trial court's decision was manifestly erroneous is a heavy one." *People v. Jones*, 2012 IL App (1st) 093180, ¶ 49.

¶ 51    Defendant contends that the trial court's decision to deny his postconviction petition was manifestly erroneous. He asserts that Detective Cannon testified falsely at trial when he stated that he observed Lockhart during the lineup. According to defendant, Detective Cannon was not present at the lineup because he was executing the search warrant at the same time. Further, he was prejudiced by the State's failure to correct Detective Cannon's testimony because "it corroborated an otherwise doubtful identification of [defendant] as the offender." The State responds that the trial court's denial was not manifestly erroneous because "there was no undisclosed evidence" and "there was no perjury."

¶ 52    The United States Supreme Court held in *Brady* that the suppression by the prosecution of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; see also *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). "This rule encompasses evidence known to police investigators, but not to the prosecutor. To comply with *Brady*, the prosecutor has a duty to learn of favorable evidence known to other government actors, including the police." *Beaman*, 229 Ill. 2d at 73.

¶ 53    "A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *Id.* at 73-74. A defendant must demonstrate all three elements to support a *Brady* violation. See *People v. Burt*, 205 Ill. 2d 28, 47 (2001) (the Illinois Supreme Court rejected the defendant's *Brady* claim because the defendant did not satisfy the first element of the test since the suppressed evidence was not exculpatory). The burden is on the defendant to establish a *Brady* claim. *People v. Rapp*, 343 Ill. App. 3d 414, 418 (2003).

¶ 54    Turning to the elements of a *Brady* claim, the first element concerns whether the State's *undisclosed* evidence is favorable to the accused because it is either exculpatory or impeaching. See *Beaman*, 229 Ill. 2d at 73. Here, defendant does not argue that the State failed to disclose the police reports detailing the search warrant and the lineup. Significantly, defendant fails to assert that any evidence, here the police reports, was not disclosed during the discovery of this case. Rather, defendant focuses his argument on Detective Cannon's alleged inaccurate testimony as establishing a *Brady* violation.

¶ 55    The basis of defendant's *Brady* claim is an inconsistency between Detective Cannon's trial testimony and police reports prepared during the investigation. The police reports detailing the preparation and execution of a search warrant and Lockhart's viewing of a lineup suggested that both occurred around 7 p.m. on April 21, 1998. However, the trial testimony indicated that the search warrant was executed on April 21, 1998, and the lineup was conducted the next day, April 22, 1998. During the detective's testimony, the prosecutor directed Detective Cannon to the date of April 22, 1998, for the lineup and the detective then testified about his observations of the lineup. However, nothing in the record or defendant's brief on appeal suggests that these police reports were withheld or not disclosed by the State in violation of *Brady*. Thus, he cannot satisfy the first element of *Brady*.

¶ 56    Similarly, defendant cannot establish that the State suppressed any evidence, willfully or inadvertently, as required by *Brady*. Again, defendant does not contend that the State suppressed any evidence, including the police reports for the lineup and search warrant. Nor does defendant argue that the State acted either willfully or inadvertently. Instead, defendant asserts that the State violated his due process rights by failing to correct Detective Cannon's "false" testimony at trial. While defendant does not explicitly allege that Detective Cannon committed perjury, he

repeatedly characterized Detective Cannon's trial testimony as "false" and "inaccurate." Defendant's only reference to "perjured testimony" is in a citation to *People v. Torres*, 305 Ill. App. 3d 679, 687 (1999) ("The State's failure to correct perjured testimony constitutes a due process violation under *Brady*."). As previously stated, defendant's argument is premised entirely on an inconsistency between Detective Cannon's sworn trial testimony and the police report for the lineup.

¶ 57    There is no question that the State's knowing use of perjured testimony in order to obtain a criminal conviction constitutes a violation of due process of law. *People v. Simpson*, 204 Ill. 2d 536, 552 (2001) (citing *People v. Olinger,* 176 Ill. 2d 326, 345 (1997)). Likewise, a conviction secured with the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *Olinger,* 176 Ill. 2d at 345 (citing *United States v. Bagley,* 473 U.S. 667, 678-80 (1985)). However, "[a] witness's testimony constitutes perjury only if the witness knowingly makes a false statement." *People v. Pulgar*, 323 Ill. App. 3d 1001, 1010 (2001). To establish a constitutional violation cognizable under the Post-Conviction Act, there must be "an allegation of knowing use of false testimony." *People v. Brown*, 169 Ill. 2d 94, 106 (1995). A witness commits perjury if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Inconsistencies in testimony cannot be equated with perjury, nor does it establish or show that the State knowingly used perjured testimony. *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002).

¶ 58    "[T]he State's obligation to correct false testimony does not amount to an obligation to impeach its witnesses with any and all evidence bearing upon their credibility." *Simpson*, 204 Ill.

21

2d at 552. "[I]mpeachment evidence may not be material where the State's remaining evidence is strong enough to preserve confidence in the verdict." *People v. Roman*, 2016 IL App (1st) 141740, ¶ 18 (citing *Smith v. Cain*, 565 U.S. 73, 75-76 (2012)). The burden of proving that the State knowingly used perjured testimony lies with the defendant. *Craig*, 334 Ill. App. 3d at 439.

¶ 59    Here, the sole basis of defendant's allegations of false testimony is the police report for the lineup. The trial testimony elicited from both Detective Cannon and Lockhart established that the lineup occurred on April 22, 1998.

¶ 60    During the trial, the prosecutor asked Detective Cannon, "Directing your attention to, specifically to April 22, 1998, were you involved in a physical lineup where a number of participants stood behind a two-way mirror---one-way mirror rather?" The detective responded in the affirmative and explained the circumstances around Lockhart's viewing of a physical lineup. He was standing in the hallway outside of the rooms where he "could see both rooms." He stated that Chief Kaminski and Detective Stonequist were present with Lockhart in the viewing room. According to Detective Cannon, Lockhart was "convulsing," "violently shaking, crying, sobbing," and "clutching" Chief Kaminski's arm while viewing the lineup. She repeatedly said she wanted "it to be over" and that she wanted to leave. The lineup lasted "around five minutes" and ended without an identification.

¶ 61    The prosecutor then went "back a day" and directed Detective Cannon's attention to the execution of the search warrant "[o]n April 21st." The detective testified that he prepared the search warrant and was present when it was executed.

¶ 62    Similar to Detective Cannon's testimony, the prosecutor asked Lockhart about the lineup, "Now, Ms. Lockhart, I am going to direct your attention now to about 8 days later, 22nd of April of 1998, in the evening hours about 7:00 o'clock at night. Did the Police, Evanston Police

Department ask you to come to the Police Department to view a physical lineup?" Lockhart

answered that she was asked by the police to view a lineup and went to the police department.

She recalled Detective Cannon being present. Lockhart identified a photograph of the lineup

conducted on April 22, 1998. No objection was raised at trial by defense counsel to this

testimony given by both Detective Cannon and Lockhart.

¶ 63    Defendant has not offered any other evidence to support his contention that the April 21

date on the police report written by a fellow officer was anything more than a mistake or

typographical error. Defendant's reliance on the *Torres* decision to support the allegation of

perjury under *Brady* is readily distinguishable from the facts in this case. There, the defendant

argued in his postconviction petition that the State failed to correct perjured testimony in

violation of *Brady*. *Torres*, 305 Ill. App. 3d at 684. Specifically, the defendant alleged that two

State witnesses testified that they did not receive leniency from the State for their testimony

against the defendant. Later, however, both testified at a codefendant's trial that they had

received a lesser sentence in exchange for their testimony at the defendant's trial. *Id*. The

reviewing court found that the State failed to comply with *Brady* by both failing to disclose the

deals given to the witnesses and failing to correct the witnesses' denials at trial that they had

received leniency. *Id*. at 686-87. The *Torres* court acknowledged that while these two were not

the only witnesses, their identifications of the defendant were "crucial" and concluded that

"[u]nder the particular facts of this case, we cannot conclude beyond a reasonable doubt that the

error did not contribute to the defendant's conviction." *Id*. at 687.

¶ 64    Unlike the circumstances in *Torres*, defendant has not alleged that the State withheld any

evidence or information about the witnesses' motivation in testifying. Further, Detective

Cannon's testimony about the lineup was not "crucial" to the determination of the case and was

corroborated by multiple witnesses.

¶ 65 We further observe that although police reports may be used for impeachment purposes, they are inadmissible as substantive evidence. *People v. Gagliani*, 210 Ill. App. 3d 617, 629 (1991); see 725 ILCS 5/115-5(c)(2) (West 2020). Police reports may also be used to refresh the recollection of a witness. *People v. Strausberger*, 151 Ill. App. 3d 832, 834 (1987); see *In re Estate of Frakes*, 2020 IL App (3d) 180649, ¶ 38 (observing that while police reports are generally inadmissible as substantive evidence, they "may be used to refresh a witness's recollection so long as the report is not merely read into evidence"). At the evidentiary hearing, all of the police officers referred to police reports to refresh their memories due to the passage of more than two decades since the investigation of Pappas's murder. "The extent to which the documents actually refreshed the witness's recollection goes to the weight, not the admissibility, of his testimony." *People v. Cantlin*, 348 Ill. App. 3d 998, 1003 (2004).

¶ 66 Detective Cannon testified at the evidentiary hearing that he had no recollection of the lineup due to the passage of more than 24 years since the lineup had occurred. He reviewed the police reports and his trial testimony to refresh his recollection, but he had no independent memory. Although Detective Cannon's testimony amounted to his agreement that the documents stated what was typed, he did not concede that his trial testimony was inaccurate. He simply agreed to what was written in the police reports and trial testimony. Since defendant has not shown that the State suppressed the alleged perjured testimony, either willfully or inadvertently, he cannot establish the required second element for a *Brady* claim.

¶ 67 While we have already found that defendant has not satisfied the first two elements required for a *Brady* claim and his claim necessarily fails, we address the third element as an additional basis to support our decision. As to this element, defendant must show that he was

prejudiced by the State's failure to correct Detective Cannon's alleged false testimony. He argues that he has demonstrated prejudice because Detective Cannon's trial testimony about Lockhart's demeanor at the lineup was "critical in corroborating" Lockhart's identification of defendant. As detailed above, defendant maintains that Detective Cannon was not present when the lineup was conducted. According to defendant, the police reports set forth "clear evidence that [Detective] Cannon's trial testimony could not have been accurate."

¶ 68     However, a defendant is not entitled to relief under *Brady* unless he can establish that the evidence improperly withheld was both favorable to the defense and material. *People v. Simpson*, 204 Ill. 2d 536, 555 (2001). "To establish materiality, a defendant must show that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *People v. Montanez*, 2023 IL 128740, ¶ 82 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Defendant's "burden is to establish a reasonable *probability* of a different result." (Emphasis in original.) *Strickler v. Greene*, 527 U.S. 263, 291 (1999).

¶ 69     For the reasons that follow, we find that defendant failed to show that he was prejudiced. Even if we assume that Detective Cannon erred in testifying that he was present at the lineup, which we do not find, this evidence was not material so as to undermine confidence in the verdict. Defendant has not established a reasonable probability that the result of defendant's trial would have been different.

¶ 70     The evidence presented at trial consisted of multiple witnesses whose accounts corroborated both each other and the circumstances of the attempted robbery and murder. Lockhart testified that she stopped at the Citgo at approximately 6:35 a.m. When she entered the store, she did not see the cashier. She looked behind the cashier's counter and saw defendant. He

25

was on his knees moving his fist up and down while holding something in his hand and hitting a man who was lying on the floor. At some point, she and defendant looked at each other. The man had "a nylon" across part of his face, but she could see his eyes, upper cheekbones, and forehead. Lockhart recognized defendant that morning because she had seen him "around" for about a year prior to April 1998. She then fled to her car. As she left, Lockhart saw a Hispanic couple drive into the gas station and motioned for them not to enter the Citgo.

¶ 71    Torres's testimony corroborated Lockhart's account. He and his wife drove to the Citgo and saw a woman exiting. She looked at Torres "in fear" and signaled for him not to enter the store. A few seconds later, Torres observed a man exit the store. The man was dressed in black pants, a black sweatshirt, and had a ski mask on. Torres described the man as having a "husky" build. The man appeared to be holding something in his right hand that he was hiding in his sweatshirt. The man then ran across Green Bay Road toward Asbury Avenue.

¶ 72    Tillman's testimony also placed defendant near the Citgo at the time of the attempted robbery that morning. Tillman was walking at around 7 a.m. and saw defendant walking south on Green Bay Road, away from the Citgo. He knew defendant and crossed the street to speak to him, but defendant gestured to Tillman and kept walking. Tillman then looked behind him and saw defendant cross the street and turn northbound in the direction of the Citgo. He identified defendant to the police as the man he saw the morning of Pappas's murder.

¶ 73    Additionally, Fomond gave extensive testimony detailing how he and defendant planned for defendant to rob the Citgo. As an employee of the Citgo, Fomond gave defendant information on where the safe was located and that the best time to rob the store was Monday between 10 and 11 a.m. when it would have the most money. When defendant saw video cameras in the store before the robbery, Fomond told defendant they were not recording because

26

the VCR was being repaired. Defendant told Fomond that he would get "one of them things," which Fomond understood to mean a gun. Defendant told Fomond that he would wear dark clothing and a mask to avoid being recognized.

¶ 74    Following the attempted robbery, defendant told Fomond that "it didn't go down right" and defendant "had to give it to him" after a struggle. Fomond understood defendant to mean that he shot Pappas. Defendant reassured Fomond that defendant would not be identified as the perpetrator because he "didn't leave them nothing to go on."

¶ 75    After the robbery, Lockhart was reluctant to assist the police. Lockhart's initial refusal to assist the police was supported by witnesses called by the defense. Officer Bell and Lieutenant Weiner both testified that the day of the shooting, Lockhart was upset, crying, nervous, and agitated. Officer Bell described Lockhart as "very nervous," she could not sit still or catch her breath and was crying. Lockhart gave short answers to Officer Bell's questions. Similarly, Lieutenant Weiner said Lockhart was "quite nervous, agitated, kept wanting to get up, have a cigarette, stand up, sit down, stand up, sit down."

¶ 76    In his reply brief, defendant asserts that the State's reliance on the testimony of Officer Bell and Lieutenant Wiener is misplaced. He contends that the officers testified that Lockhart "was nervous and upset on the day she had just witnessed someone beat a man to death" but neither offered testimony about Lockhart's demeanor at the lineup a week later. While this is accurate, the testimony of both Officer Bell and Lieutenant Wiener is relevant when viewing Lockhart's behavior during the initial investigation and her ongoing hesitancy to cooperate with the police.

¶ 77    Significantly, Lockhart herself explained that she refused to identify defendant at the lineup. According to Lockhart, defendant was present in the lineup, but she told the officers that

she "wanted to go home," would not "cooperate," and would not "tell them anything." She described her mental state as "nervous" and "scared." As we have outlined, the evidence presented at trial corroborated Detective Cannon's testimony that Lockhart was a reluctant witness during the investigation after the shooting.

¶ 78    In addition, at the suppression hearing, Detective Hutton testified that both he and Detective Cannon were present at the April 22, 1998, lineup viewed by Lockhart and admitted that he did not list Detective Cannon on the police report.

¶ 79    Moreover, as the panel on defendant's direct appeal observed, "Each officer who dealt with Lockhart during the course of the investigation testified to her agitated emotional state, using such terms as 'nervous,' 'convulsing,' 'violently shaking,' 'crying,' and 'sobbing' to describe her demeanor. Lockhart herself testified that she did not cooperate in the investigation because she feared for her safety and the safety of her family." *Smith*, 362 Ill. App. 3d at 1079. Significantly, the court pointed out that "Lockhart testified that her failure to pick defendant out of the April 22, 1998, lineup was not out of an inability to do so but, rather, out of the fear, justified or not, of what might happen to her if she did. It is not that she *could not,* it is that she *would not* identify defendant." (Emphasis in original.) *Id*.

¶ 80    After reviewing all of the trial evidence, it is clear that defendant cannot establish the requisite prejudice under *Brady*. Lockhart, Torres, and Tillman provided detailed eyewitness accounts that corroborated each other's testimony. Both Lockhart and Tillman placed defendant at or near the scene of the crime. Further, Fomond explained the plan for defendant to rob the Citgo that corroborated the eyewitness accounts and the evidence of the crime. Additionally, Officer Bell, Lieutenant Weiner, and Lockhart herself described Lockhart's initial hesitation in assisting the police investigation. Given this significant evidence, defendant cannot establish a

reasonable probability that absent Detective Cannon's testimony about Lockhart's demeanor at the lineup, the result would have been different.

¶ 81    In arguing that he established the requisite prejudice, defendant points out that there was no physical evidence connecting him to the offense and relies on the decision in *Beaman*, 229 Ill. 2d 56. However, we find the *Beaman* decision does not assist him. In that case, the State argued at trial that the defendant murdered his former girlfriend after discovering that the victim had begun a relationship with the defendant's former roommate. *Beaman*, 229 Ill. 2d at 64-65. There, the defendant contended that the State had violated its constitutional obligation under *Brady*, by failing to disclose evidence concerning a third man as an alternate suspect. *Id*. at 66. Evidence presented at the evidentiary hearing demonstrated that the State had failed to disclose evidence implicating an alternate suspect, including that: (1) the man had previously been in a romantic relationship with the victim and told police they had planned to renew that relationship; (2) the man had been charged for domestic battery of another girlfriend, who told police that the man acted erratically due to his use of steroids; and (3) the man admitted that that he had supplied the victim with drugs and that the victim owed him money. *Id*. at 66-68.  The *Beaman* court held that the impact or strength of the undisclosed evidence could only be determined by also viewing the strength of the evidence presented against the defendant. *Id*. at 77. In its analysis, the supreme court noted that "courts must consider the cumulative effect of all the suppressed evidence rather than considering each item of evidence individually." *Id*. at 74. The court concluded that the withheld evidence was favorable to the defendant because the "combination of the undisclosed evidence with the disclosed evidence tending to establish [the unknown man] as a viable alternative suspect cannot be considered remote or speculative, particularly in light of the State's evidence" against the defendant, which was largely circumstantial. *Id*. at 78, 80.

¶ 82    Here, in stark contrast, as previously discussed, the State presented direct evidence of defendant's guilt based on Lockhart's identification of defendant as the perpetrator. Her identification was supported by Tillman's testimony identifying and placing defendant near the scene of the crime at the time it occurred. Unlike in *Beaman*, there is no dispute that the police reports were not withheld from defendant. Further, Detective Cannon's testimony about the lineup did not prejudice defendant.

¶ 83    After reviewing all this evidence, the trial court found that Detective Cannon "was not lying about his whereabouts which [was] corroborated by Lockhart's testimony of when she viewed the lineup." The court reached this conclusion based on its review of the evidence at trial, namely that Lockhart herself testified about her initial refusal to cooperate and why she did not identify defendant in April 1998, as well as the testimony from both Officer Bell and Lieutenant Wiener. The trial court observed that defendant "ignore[d] all the other evidence" presented at trial and concluded that "taking that testimony at trial about the dates and looking at those two reports and exhibits it leads me to believe that when considering the trial testimony that the discrepancy in the dates can be attributed to a typo in light of the trial testimony." We agree with the trial court.

¶ 84    "Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief." *People v. Gray*, 2017 IL 120958, ¶ 47. We find any discrepancy between the detectives' testimony in this testimony to be minor and did not render Detective Cannon's testimony false. Moreover, even if Detective Cannon's testimony about Lockhart's demeanor was absent from the trial evidence, defendant cannot show that there was a reasonable probability of a different result. See *Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). While defendant has asserted that Detective Cannon's testimony was "critical in corroborating Lockhart's identification" of defendant, no identification occurred at the lineup. Significantly, Lockhart did not identify defendant as the perpetrator until two years later in April 2000. There is not a reasonable probability that the result would have been different because evidence of Lockhart's reluctance was presented by multiple witnesses, including Lockhart herself. Therefore, defendant cannot establish the third required element to support a *Brady* violation.

¶ 85    Further, there is another aspect of the trial testimony that supports the trial court's conclusion that the date on the April 21 report was a typographical error. We begin by reviewing the timeline of defendant's arrest and time in custody to ascertain the likelihood that both the search warrant and the lineup occurred at the same time. According to a police report attached to defendant's petition, defendant was taken into custody at approximately 1 p.m. on April 21, 1998, outside the Skokie Courthouse. Defendant's arrest report listed the date and time of the arrest as 2 p.m. on April 21, 1998.

¶ 86    The next police report, which detailed the search warrant and was prepared by Detective Cannon on April 22, 1998, provided:

> "On 04/21/98 R/I, along with Sgt. P. McConnell prepared a search warrant for the premises located at [1900 block of] Jackson, Evanston, Illinois, first floor apartment. The search warrant was reviewed by A.S.A. Jonathon Lerner, and subsequently signed by Judge Garrett Howard at 5600 Old Orchard Rd., Skokie, II, on 04/21/98 at 1740 hours.
>
> The search warrant for the above premises was then executed at

[defendant's residence], Evanston, at about 1900 hours.

Property seized was inventoried, and will be detailed in the return of the search warrant inventory at a later date."

The search warrant corroborated Detective Cannon's police report that it was signed by Judge Howard at 5:40 p.m. on April 21, 1998.

¶ 87 The police report for the lineup was prepared by Detective Hutton on April 22, 1998, and stated:

"In reference to this Investigation on 21APRIL98 at approximately 1910 Hrs a physical line-up was held at the Evanston Police Department.

The witness in this incident is a Dawn Lockhart. Present with Lockhart in the viewing area during the line-up, were the following: Detective Stonequist, Sgt Hollander and Chief Kaminski of the Evanston Police Department. Ms Lockhart also had a female companion with her.

Prior to conducting the line-up [defendant] was given the opportunity to pick which position he would stand at. He chose the number two position.

***

After viewing the line-up the witness was unable to positively identify the offender in this incident."

¶ 88 According to these documents, defendant was taken into custody at 1 p.m. on April 21, 1998, and his arrest was processed at 2 p.m. Detective Cannon then prepared a search warrant. At approximately 5:40 p.m., the search warrant was signed by Judge Howard, and subsequently executed at 7 p.m. These times and the date are corroborated by the arrest report and the signed search warrant. According to defendant, the police were able to contact Lockhart, have her arrive

at the police station, gather the additional participants for the lineup, and conduct the lineup within five hours of processing defendant's arrest, while the search warrant was being prepared and then executed. As the Illinois Supreme Court has stated, this court is "not required to suspend common sense in evaluating the evidence in the record." *People v. Jimerson,* 166 Ill.2d 211, 227 (1995); see *People v. Diaz*, 297 Ill. App. 3d 362, 371 (1998) (a reviewing court does not have to ignore common sense). Further, the trier of fact is not expected to disregard inferences which flow normally from the evidence. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A common sense consideration of this evidence leads to the inference that it was likely improbable that the lineup occurred within hours of defendant's arrest and, as already pointed out above, the trial testimony supports this conclusion. As a final note, it makes little sense that the lead detective would not be involved in both the execution of the search warrant and conducing the lineup for an eyewitness.

¶ 89    Detective Hutton prepared the police report on April 22, 1998, but notably did not list himself as present for the lineup. The discrepancy in the date could easily be compared to a scrivener's error. See *In re Marriage of Crecos*, 2015 IL App (1st) 132756, ¶ 17 (a "scrivener's error" is a clerical error resulting from a minor mistake or inadvertence when writing or when copying something on the record, including typing an incorrect number). The timeline following defendant having been taken into custody on April 21, 1998, also supports this conclusion.

¶ 90    We are not persuaded by defendant's argument in his reply brief that his claim cannot be resolved as a typographical error. According to defendant, the evidence at trial does not rebut his assertion that Detective Cannon testified falsely at trial because (1) the trial testimony regarding the lineup occurring on April 22nd was provided by the prosecutor; (2) Detective Cannon and Lockhart gave conflicting testimony as to whether the detective was in the viewing room at the

time of the lineup; and (3) Detective Hutton's testimony at the evidentiary hearing "made clear" that Detective Cannon could not have observed Lockhart from his position outside the viewing room. We have already considered and rejected each of these arguments. First, we acknowledged that the prosecutor included the date in her questions to both Lockhart and Detective Cannon. No objection was made that the date was in error. Second, the prosecutor asked Lockhart, "You remember Detective Cannon also being on that side of the one-way mirror with you?" and Lockhart answered in the affirmative. This alone does not establish conflicting testimony because Detective Cannon testified that he was able to view Lockhart, it corresponds that Lockhart was also able to view the detective. Third, Detective Hutton's testimony did not make clear that Detective Cannon could not have observed Lockhart. In his testimony at the evidentiary hearing, Detective Hutton stated, "you would have to move either holding the door inside the viewing room or to the other side to view the lineup room. I don't think you could do both at the same time." This testimony does not refute that Detective Cannon could not have viewed Lockhart in the viewing room as well as the lineup room, at best Detective Hutton testified that an individual could not view both simultaneously. Detective Cannon testified that he was able to see both rooms but did not indicate that he could view both at the same time.

¶ 91    Moreover, the evidence presented at trial clearly established that Lockhart was a noncooperative and reluctant witness immediately following the shooting and was corroborated by Lockhart herself as well as officers in addition to Detective Cannon. In light of the evidence supporting Detective Cannon's testimony, we cannot conclude that any false or perjured testimony was presented in violation of *Brady*. Since defendant has failed to satisfy any of the three required elements to support a violation of *Brady*, his claim fails. Accordingly, the trial court's denial of defendant's postconviction petition following an evidentiary hearing was not

manifestly erroneous.

¶ 92    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook

County.

¶ 93    Affirmed.